[No. S004642. Crim. No. 23921. June 13, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM KIRKPATRICK, Defendant and Appellant.

994

## COUNSEL

Harvey R. Zall and Fern M. Laethem, State Public Defenders, and Edward J. Horowitz, under appointments by the Supreme Court, Christine Zilius Mason, Musawwir Spiegel, George L. Mertens and Albert W. Brodie, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, Edward T. Fogel, Jr., and Carol Wendelin Pollack, Assistant Attorneys General, Marc Alan Hart, Gary R. Hahn, Donald E. de Nicola, William R. Weisman, William T. Harter, Marc E. Turchin, Susan Lee Frierson and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—Defendant William Kirkpatrick appeals from a judgment of death under the 1978 death penalty law (Pen. Code, § 190.1 et seq.; all further statutory references are to this code unless otherwise indicated). A jury convicted defendant of two counts of first degree murder (§ 187), two counts of robbery (§ 211), and two counts of burglary (§ 459). The jury found as special circumstances that defendant had been convicted of more than one offense of murder in this proceeding (§ 190.2, subd. (a)(3)) and that the murders were committed in the perpetration of robbery and burglary (§ 190.2, subd. (a)(17)), and it found that defendant used a firearm to commit the offenses (§§ 1203.06, subd. (a)(1), 12022.5). After the jury returned a penalty verdict of death, the trial court denied the automatic motion to modify penalty (§ 190.4, subd. (e)), sentenced defendant to death on the two murder counts, and stayed execution of sentence on the remaining counts and enhancement allegations. This appeal from the judgment of death is automatic. (§ 1239, subd. (b).)

### FACTS AND PROCEEDINGS

At about midnight on September 17, 1983, Jim Falconio and Wayne Hunter were found in a closet at a Taco Bell franchise restaurant in Burbank. Both had been shot in the head. Hunter was dead when found and Falconio died of his gunshot injuries 11 days later. The two victims were Taco Bell employees and had apparently been killed in the course of a robbery. The case against defendant, who had formerly worked at the same Taco Bell restaurant, included evidence that four days earlier defendant had obtained a

gun that could have been the murder weapon by burglarizing another former place of employment, a gas station.

*The Prosecution's Case*

In late April or early May of 1983, defendant arranged a job interview for Donald Harper at the Burbank Taco Bell where defendant was then working. While Harper was at the Taco Bell for his interview, defendant told Harper he was upset about being transferred to a different Taco Bell location. Defendant said he wanted to "get back" at Wayne Hunter (an assistant manager) and at Fahimur Rehman (the district manager). Defendant said he wanted to kill Rehman, to stick a gun into Hunter's mouth and blow his head off, and to take the money from the register. Defendant asked Harper to obtain the combination of the safe, but Harper merely replied that defendant was crazy.

During the night of September 13-14, 1983, a gas station in North Hollywood was burglarized. Defendant had been fired from his employment at the station a few weeks earlier. Although the station had been locked as usual before closing on the 13th, and the burglar alarm activated, the station was found unlocked the next morning, and the alarm disconnected, with no signs of forced entry. A cash box and a desk drawer had been broken open. Items taken in the burglary included currency and coins, a .22-caliber pistol, a battery charger, and a customer's car stereo and equalizer. Two station employees had seen defendant near the station shortly before it closed on the 13th.

During the early morning of September 14, defendant showed Manuel Rand a battery charger, a bag of coins, a car stereo, and a .22-caliber pistol. These items were in the back of defendant's automobile. Defendant said that he had burglarized a garage where he had previously worked, and that it would "teach them a lesson" for having fired him. On September 16, defendant asked Rand to help him commit a robbery but Rand refused. On the evening of September 17, defendant told Rand he was planning to rob the Burbank Taco Bell and asked Rand to help. Again Rand refused. Defendant then drove to an apartment complex where he met Eddie Salazar, known as Solo. Salazar borrowed lipstick and rubbed it over the tattoos on his neck. Defendant and Salazar left the apartment complex, after push-starting defendant's car, at approximately 11 p.m.

Around 11:50 p.m., two prospective customers found the Burbank Taco Bell open but apparently deserted. They telephoned the police. Shortly before the police arrived, persons gathering at the scene found the two

victims in a closet in the employee area at the back of the restaurant. There was no money in the safe; one of the registers was open and contained only loose coins. The money taken was estimated to be $625. There were no signs of a struggle. Police investigators found an expended .22-caliber bullet in the closet.

Hunter died from a single shot to the back of the head with a small-caliber bullet, apparently fired from a distance of at least 18 inches. On Hunter's left upper cheek were a bruise and an abrasion that could have been caused by a blow. Falconio, who was 16 years old on September 17, was killed by a single bullet which entered behind the right ear and exited behind the left ear.

Defendant and Salazar returned to the apartment complex shortly after midnight. Salazar showed some money to Gina Esqueda. Victor Saldana saw defendant lift his shirt to reveal a gun in his waistband. Defendant drove to Rand's house and asked Rand's mother to awaken Rand. Defendant said the cops were looking for him and that he had just killed two guys, possibly a third. Rand's mother refused to awaken Rand but she did help defendant push-start his car. That afternoon, Rand's mother saw defendant holding a box containing rolls of coins. Defendant said the rolls were money taken in a robbery.

During that day, September 18, defendant telephoned Fidel Saballos, who had formerly worked with defendant at the Burbank Taco Bell. Defendant said he had a "bunch of money" and invited Saballos to the movies. Saballos accepted. In defendant's car, defendant showed Saballos a bag of coins. Defendant said he had "ripped off" the Taco Bell the previous night and had taken $850. Defendant said he had used "a .22" to kill two people, and that he done so because he did not want any witnesses.[1]

Defendant was arrested on September 22. In defendant's automobile, police investigators found three .22-caliber cartridges and the equalizer taken in the gas station burglary. The cartridges were consistent with the expended bullet found in the closet of the Taco Bell restaurant.

*The Defense Case*

Defendant testified in his own behalf. He was from New York City. His mother was Mexican and his father Black. For the six months to one year

---

[1]To prove the facts stated in this paragraph, the prosecution relied on various out-of-court statements by Saballos, including a tape-recorded interview with Burbank police investigators. The evidence was admitted under the hearsay exception for prior inconsistent statements after Saballos testified and denied that defendant had made any incriminating statements to him.

before his arrest, defendant had worked in restaurants and gas stations. On the evening of September 13, 1983, defendant went to a gas station where he had formerly been employed. He talked to the employees, asking if they had anything they wanted to sell. Defendant was then self-employed in a kind of salvage business. Defendant said he did not enter the station after it was closed and did not take anything from the station. He denied any knowledge of the gas station burglary and denied telling Rand or anyone else he had burglarized a gas station. He testified that the equalizer found in his car was one he had purchased in June or July of 1983.

On the evening of September 17, 1983, defendant went to an apartment complex where he met members of a gang known as "Sol Trese." He allowed several of these individuals to use his car to "shoot" heroin. One of them had a bag with loose .22-caliber shells. Defendant did not own or possess a .22-caliber weapon. Defendant left about 11:15 or 11:20 p.m. to visit a friend in Whittier. He had car problems and spent some time searching for an open gas station. Eventually, about 12:20 or 12:30 a.m., defendant purchased a new battery and battery cable. After spending some time in a bar, defendant spent the rest of the night in a motel room. Defendant denied entering the Burbank Taco Bell on the night of September 17-18 and he denied having a conversation with Rand's mother during the early morning of September 18. Defendant said he went to the movies with Saballos on September 18, but defendant denied having any conversation with Saballos about a robbery or killing people.

A service station attendant testified that he had no independent recollection of selling a battery and cable to defendant but that the station records indicated he had made such a sale on September 18, 1983. The records did not indicate the time of the sale, but they did indicate it had occurred after a sale to a Robert Salisbury. At that time, the attendant was working the night shift from 9 p.m. to 9 a.m.

*Rebuttal*

Robert Salisbury testified that during the early morning hours of September 18, 1983, he purchased a battery at a service station. The attendants were busy doing other things and it took about two hours to have the battery installed. Salisbury left about 2 a.m. During the two hours he was at the station, no other car was there having a battery put in.

*Penalty Phase*

On March 8, 1983, 17-year-old Jacob D. was working at a franchise restaurant. After finishing work that evening, he met defendant, who invited

him to drink some beer. Jacob accepted. Defendant bought some beer and led Jacob to a red van parked near a gas station. Defendant and Jacob drank beer and talked inside the van for some time. Defendant asked Jacob to help him change a flat tire, but as Jacob was leaning over to pick up the spare tire, defendant grabbed him around the neck, began to choke him, and told him to take his clothes off. At first Jacob refused, but when defendant tightened his grip Jacob removed his clothes. Defendant removed his clothes also and forced Jacob to orally copulate him and to kiss various parts of defendant's body. Defendant threatened to kill Jacob if Jacob did not comply. After some time, both Jacob and defendant fell asleep in the van, with defendant still holding Jacob. The following day, Jacob told his parents what had happened.

On March 27, 1983, defendant invited 16-year-old Stephen T. to go to a park and drink beer. Stephen accepted. While they were drinking beer in the park, defendant asked Stephen to assist him in robbing a man who lived in a residence nearby. When Stephen refused, defendant grabbed him around the neck and started to choke him. Defendant pulled Stephen to the park restroom and tried to push Stephen's head into the toilet. Stephen managed to loosen defendant's grip and escape by picking defendant up and ramming him against a sink. Stephen told his mother about the incident, and she reported it to the police.

In May 1983, defendant left a bicycle, a calculator, and a projector at Shirley Johnson's house. The next morning, defendant retrieved the bicycle and projector, but Johnson could not find the calculator. Defendant threatened injury to Johnson and her children as well as damage to Johnson's house if the calculator was not returned to him. About two weeks later, during a telephone conversation with Johnson, defendant threatened to harm Johnson's daughter and her two dogs if the calculator was not returned. Johnson replied that she would have to contact her son, who was in juvenile hall, and she could not do so until June 19.

Johnson returned from work one day in the latter part of June to find both her dogs completely paralyzed. The dogs recovered after several weeks. Defendant telephoned Johnson and said he had "taken care" of the dogs. Defendant said Johnson had better watch out for her daughter because defendant had not had any "white meat" for a long time. Defendant added that he wanted the calculator. Johnson located the calculator and returned it to defendant.

Defendant testified that he was 23 years old in September 1983 and had never been convicted of a felony. Defendant was born in Brooklyn, New York, and had been raised by his mother. He never met his natural father.

Defendant's stepfather, a detective-sergeant for the New York City Police Department, had died two years earlier. Defendant left New York in September 1980. At defendant's request, his attorneys did not attempt to have his mother, who still lived in New York, testify at the trial. Defendant did not want her or any member of his family involved in the case.

Defendant had attended public schools through the 11th grade before dropping out. Since that time, defendant had held jobs involving delivery, driving, cooking, and management. Defendant was interested in writing, painting, and drawing, and had ambitions of becoming a published writer. Defendant denied being homosexual. Defendant believed that while in prison he could make a contribution to other inmates and to society by taking classes and continuing with his writing. Defendant again asserted his innocence of the capital crimes and asked the jury to give him an opportunity, by sparing his life, to prove he could be a constructive human being.

CLAIMS, ANALYSIS, AND RULINGS

I. *Pretrial Motion for Cocounsel Status*

Defendant was represented in superior court proceedings by Attorneys Albert Del Gobbo and Ray Fountain. During a hearing three weeks before trial, Del Gobbo stated that defendant had asked him to make a motion to have defendant appointed as cocounsel and that Del Gobbo had agreed to do so. The trial court denied the motion, remarking that there were four attorneys in the case already (two for the defense and two for the prosecution) and that "one more would not benefit it in any way." The court also observed that other defendants who were "actually trying their own cases" needed access to the jail's "pro per" facilities more than defendant did. Defendant maintains that the trial court abused its discretion in denying his motion, and that the ruling must be presumed to have prejudiced his defense.

A defendant in a criminal proceeding has a constitutional right to be represented by professional counsel and also a constitutional right of self-representation, but these rights are mutually exclusive. (*People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1162 [259 Cal.Rptr. 701, 774 P.2d 730].) "Stated otherwise, at all times the record should be clear that the accused is either self-represented or represented by counsel; the accused cannot be both at once." (*People* v. *Bloom* (1989) 48 Cal.3d 1194, 1219 [259 Cal.Rptr. 669, 774 P.2d 698].) Here, defendant's motion did not seek either of the constitutionally guaranteed forms of representation. Defendant was already represented by professional counsel and the motion was not, either in form or

substance, one for self-representation. In particular, defendant did not indicate that he was dissatisfied with the representation he was receiving or that he intended to assume control of the case rather than merely assisting his attorneys in its presentation. (See *ibid.*)

Whether a professionally represented defendant may participate in the presentation of the case is a matter within the sound discretion of the trial judge. (*People v. Miranda* (1987) 44 Cal.3d 57, 75-76 [241 Cal.Rptr. 594, 744 P.2d 1127].) Such an arrangement should not be permitted except upon a substantial showing that it will "promote justice and judicial efficiency in the particular case." (*People v. Hamilton, supra*, 48 Cal.3d 1142, 1162.) No such showing was even attempted in this case. Defendant maintains that the trial court gave him no opportunity to make the required showing, but the record does not support this assertion. We have not imposed on trial courts a duty to expressly invite a showing in support of, or to inquire into the reasons for, a motion for cocounsel status (see *ibid.; People v. Miranda, supra*, at pp. 75-76), and we decline to do so now. We find nothing in the record to indicate that either defendant or his counsel desired to add anything to counsel's statement of the motion, much less that they were prevented from doing so. (Cf. *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].) Certainly the record does not show that the court cut off either defendant or his counsel. On this record, we conclude that denial of the motion was not an abuse of discretion. (*People v. Hamilton, supra*, at p. 1162; *People v. Miranda, supra*, at pp. 75-76.)

## II. *Voir Dire*

■ During the death-qualification of prospective jurors, a dispute developed between the defense and the prosecution concerning the permissible scope of voir dire. The trial court resolved the split during and immediately after the death-qualification voir dire of prospective juror Fasana. The court rejected the prosecutor's position that voir dire should be restricted to inquiry concerning the prospective jurors' views on the death penalty in general or as a punishment for the offenses and special circumstances charged in the information. The court agreed with defense counsel that the parties should be permitted to ask prospective jurors whether they would always or never vote for the death penalty in cases involving any generalized facts, whether pleaded or not, that were likely to be shown by the evidence at trial. The court also ruled, however, that voir dire on unpleaded facts could be used only to assist the parties in exercising peremptory challenges and not to establish grounds for disqualification.

The latter aspect of the court's ruling was incorrect. ■ Although the death penalty voir dire "seeks to determine only the views of the prospective

jurors about capital punishment in the abstract" (*People* v. *Clark* (1990) 50 Cal.3d 583, 597 [268 Cal.Rptr. 399, 789 P.2d 127]), a challenge for cause should be sustained as to any prospective juror whose views on capital punishment would prevent or substantially impair the performance of the juror's duties as a juror in accordance with the court's instructions and the juror's oath (*Wainright* v. Witt (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844]). A prospective juror who would invariably vote either for or against the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating and mitigating circumstances, is therefore subject to challenge for cause, whether or not the circumstance that would be determinative for that juror has been alleged in the charging document. (See, e.g., *People* v. *Livaditis* (1992) 2 Cal.4th 759, 772-773 [9 Cal.Rptr.2d 72, 831 P.2d 297]; *People* v. *Pinholster* (1992) 1 Cal.4th 865, 917-918 [4 Cal.Rptr.2d 765, 824 P.2d 571].)

█ Although the trial court's ruling was incorrect in this one respect, the ruling did not restrict voir dire. During the death-qualification process, defense counsel was permitted to fully explore the prospective jurors' death penalty views as applied to the general facts of the case, whether or not those facts had been expressly charged. Even assuming that the trial court's erroneous view of the grounds for disqualification in some way inhibited questioning during the death-qualification phase of jury selection, counsel was free to use the general voir dire to explore the prospective jurors' reactions to the facts and circumstances of the case. Thus, defendant was not prejudiced. (See *People* v. *DeSantis* (1992) 2 Cal.4th 1198, 1217-1218 [9 Cal.Rptr.2d 628, 831 P.2d 1210].)

█ We also reject defendant's contention that the trial court erred in denying a defense challenge for cause to prospective juror Fasana. To preserve a claim of error in the denial of a challenge for cause, the defense must either exhaust its peremptory challenges and object to the jury as finally constituted or justify the failure to do so. (*People* v. *Garceau* (1993) 6 Cal.4th 140, 174 [24 Cal.Rptr.2d 664, 862 P.2d 664]; *People* v. *Raley* (1992) 2 Cal.4th 870, 904-905 [8 Cal.Rptr.2d 678, 830 P.2d 712].) Here, the defense did not exhaust its peremptory challenges, and the sole justification offered for failing to do so that the trial court improperly restricted voir dire is unsupported by the record. Accordingly, we do not review the denial of the defense challenge for cause to prospective juror Fasana.

III. *Penalty Phase Counsel Issues*

Near the end of the guilt phase, defendant wrote the trial court to express dissatisfaction with his attorneys and to request their dismissal. On Wednesday, June 6, 1984, after the jury had returned its guilt verdicts, the court held

a hearing at which defendant moved to represent himself in further proceedings, with the attorneys who had been representing him acting as advisory counsel. The court questioned defendant about his ability to conduct his own defense and warned him of the dangers of self-representation. The court inquired whether defendant would be ready to proceed on the following Wednesday, June 13, the day set for starting the penalty phase. Defendant said he would need additional time but only to June 18, the Monday after the date previously set. Defense counsel urged the court to deny the motion for self-representation because in their view self-representation would not be in defendant's best interests. The court then took the matter under submission.

At the next hearing, the trial court denied the motion for self-representation. After a recess, defendant indicated he would accept cocounsel status in lieu of self-representation. The trial court granted the request for cocounsel status. Defendant acted as cocounsel throughout the penalty phase.

Defendant contends that the trial court erred in denying his motion for self-representation, that his trial counsel provided ineffective assistance by opposing his motion for self-representation, that the trial court abused its discretion in granting him cocounsel status, and that the trial court did not adequately advise him of the risks of acting as cocounsel.

### A. Denial of Self-representation Motion

■ Defendant argues that a criminal defendant's right to self-representation under the Sixth and Fourteenth Amendments to the United States Constitution, as defined and explained by the United States Supreme Court in *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525], extends to the penalty phase of a capital trial. Recognizing that the right of self-representation is absolute only if asserted a reasonable time before trial begins (*People* v. *Windham* (1977) 19 Cal.3d 121, 127-129 [137 Cal.Rptr. 8, 560 P.2d 1187]), defendant further argues that the guilt and penalty phases of a capital prosecution should be deemed separate trials, so that a motion for self-representation at the penalty phase is timely if made a reasonable time before the penalty phase begins.

For the purpose of assessing the timeliness of a motion for self-representation, the guilt and penalty phases in a capital prosecution are not separate trials but parts of a single trial. (*People* v. *Hardy* (1992) 2 Cal.4th 86, 194-195 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People* v. *Hamilton* (1988) 45 Cal.3d 351, 369 [247 Cal.Rptr. 31, 753 P.2d 1109].) Accordingly, when a defendant seeks self-representation for the penalty phase, the trial court has discretion to grant or deny the motion if not made a reasonable time before

the guilt phase has begun. (*People* v. *Hardy*, *supra*, at pp. 194-195; *People* v. *Bloom*, *supra*, 48 Cal.3d 1194, 1220; *People* v. *Hamilton*, *supra*, 45 Cal.3d at p. 369.) Defendant's motion, made after the guilt verdicts were returned, was addressed to the trial court's sound discretion.

■ We reject defendant's contention that the trial court abused its discretion when it denied his motion for self-representation. In ruling on a midtrial motion for self-representation, the trial court is to consider "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*People* v. *Windham*, *supra*, 19 Cal.3d 121, 128.) Here, the trial court's comments reveal that it carefully considered each of these factors. It found that defense counsel had performed "quite admirably" in representing defendant, that the reasons defendant gave for seeking self-representation were not compelling, that defendant would need a continuance if granted self-representation, and that some disruption would inevitably result. These findings are supported by the record. Accordingly, the trial court did not abuse its discretion in denying the motion for self-representation.

## B. *Effective Assistance of Counsel*

When defendant made his motion for self-representation, his counsel made a brief statement in opposition.[2] Counsel argued that it was not clear that a defendant's right of self-representation extended to the penalty phase

---

[2]"Your Honor, . . . it is not in the best interests of our client to have him represent himself at the penalty phase. [¶] I've given some thought as to whether or not a defendant really has a constitutional right to defend himself at the penalty phase. [¶] We all know that if he had chosen this course of action from the inception, he could represent himself in a capital case during the guilt phase of the trial. [¶] I would ask the court to give some strong consideration as to whether or not the defendant at this juncture, having been convicted of the offenses, having been convicted of the offense he has been convicted of, really has a constitutional right under the cases that allow pro per representation, him [*sic*] to represent himself at the penalty phase.

"The consequences of doing that are so potentially severe, that I think the court, counsel, all parties involved, should lean over backwards and do whatever they can to protect the defendant's best interests, even though the defendant may think that his course of action was the wiser course.

"So with those comments, I would ask the court to consider denying Mr. Kirkpatrick's request to represent himself at the penalty phase and allow [cocounsel] and I [*sic*] to go ahead and conduct the penalty phase as we think we should for the best interests of our client.

"We will try to get whatever cooperation we can from Mr. Kirkpatrick. There are certain things we will not be able to do without his cooperation; but I'm afraid that if this defendant is allowed to proceed with his own defense and [cocounsel] and I are privy to certain things that the court and [the prosecutor] would not be privy to, that it may very well result in this jury sentencing him to death in the gas chamber, where I think that if [cocounsel] and I

of a capital trial, that in a death-penalty case everyone concerned should "lean over backwards" to assure that the defendant's interests were protected, and that private discussions with defendant had persuaded counsel that self-representation would likely result in a death verdict whereas there was a "very good chance" that the jury would opt for the alternative penalty of life in prison without possibility of parole if counsel continued to represent defendant at the penalty phase.

 Defendant argues that his trial counsel provided ineffective representation when they took a position in opposition to their client's stated wish to represent himself. He argues that just as counsel may not prevent a defendant from testifying (*People* v. *Robles* (1970) 2 Cal.3d 205, 215 [85 Cal.Rptr. 166, 466 P.2d 710]), counsel lack authority to oppose a client's decision on the matter of self-representation. Defendant further argues that on questions of representation counsel's personal interest in continuing representation conflicts with counsels duty of loyalty to the client, and that this conflict of interest imposes upon counsel a duty to refrain from arguing against the client's motion for self-representation.

We are not persuaded. To establish a violation of the constitutional right to effective assistance of counsel, a defendant must show that his counsels performance was deficient when measured against the standard of a reasonably competent attorney, and that counsel's performance was prejudicial in the sense that it "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 686 [80 L.Ed.2d 674, 692-693, 104 S.Ct. 2052]; *id.* at pp. 686-694 [80 L.Ed.2d at pp. 692-698]; see also *People* v. *Wader* (1993) 5 Cal.4th 610, 636 [20 Cal.Rptr.2d 788, 854 P.2d 80].) If a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient. (*Strickland* v. *Washington, supra,* at p. 697 [80 L.Ed.2d at pp. 699-700].)

 Here, defendant has failed to show that the challenged action of counsel—opposing defendants motion for self-representation—was prejudicial. He has not shown a reasonable probability that the penalty verdict would have been more favorable had counsel not opposed his motion for self-representation. Assuming for argument's sake that the trial court would have granted the motion for self-representation had counsel not opposed it,

---

continue to represent the defendant, we feel that we have a very good chance of getting this jury to come back with life in prison without the possibility of parole.

"For those reasons, I would ask the court to deny Mr. Kirkpatrick's request."

BELOW IS A PASTE-OVER CRACK-AND-PEEL INSERT FOR CORRECTION OF PRINTER'S ERRORS IN THE BOUND VOLUME REPORT OF PEOPLE v. KIRKPATRICK (1994) 7 CAL.4TH 988, AT PAGE 1008, STARTING WITH THE FIRST NEW PARAGRAPH AND EXTENDING TO THE BOTTOM OF THE PAGE.

Please tear off the insert along the perforation, remove the peel-off backing, and adhere the insert in its proper place so it covers lines 8 through the bottom of page 1008.

(7a) Defendant argues that his trial counsel provided ineffective representation when they took a position in opposition to their client's stated wish to represent himself. He argues that just as counsel may not prevent a defendant from testifying (*People v. Robles* (1970) 2 Cal.3d 205, 215 [85 Cal.Rptr. 166, 466 P.2d 710]), counsel lack authority to oppose a client's decision on the matter of self-representation. Defendant further argues that on questions of representation counsel's personal interest in continuing representation conflicts with counsel's duty of loyalty to the client, and that this conflict of interest imposes upon counsel a duty to refrain from arguing against the client's motion for self-representation.

We are not persuaded. (8) To establish a violation of the constitutional right to effective assistance of counsel, a defendant must show that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney, and that counsel's performance was prejudicial in the sense that it "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland v. Washington* (1984) 466 U.S. 668, 686 [80 L.Ed.2d 674, 692-693, 104 S.Ct. 2052]; *id.* at pp. 686-694 [80 L.Ed.2d at pp. 692-698]; see also *People v. Wader* (1993) 5 Cal.4th 610, 636 [20 Cal.Rptr.2d 788, 854 P.2d 80].) If a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient. (*Strickland v. Washington, supra,* at p. 697 [80 L.Ed.2d at pp. 699-700].)

(7b) Here, defendant has failed to show that the challenged action of counsel—opposing defendant's motion for self-representation—was prejudicial. He has not shown a reasonable probability that the penalty verdict would have been more favorable had counsel not opposed his motion for self-representation. Assuming for argument's sake that the trial court would have granted the motion for self-representation had counsel not opposed it,

continue to represent the defendant, we feel that we have a very good chance of getting this jury to come back with life in prison without the possibility of parole.

"For those reasons, I would ask the court to deny Mr. Kirkpatrick's request."

defendant gives us no reason to believe that denial of the motion adversely affected the presentation of the penalty defense. As the United States Supreme Court has observed, "the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant." (*McKaskle* v. *Wiggins* (1984) 465 U.S. 168, 177, fn. 8 [79 L.Ed.2d 122, 133, 104 S.Ct. 944].) Moreover, the trial court subsequently granted defendant cocounsel status, and as cocounsel defendant was able to cross-examine each of the prosecution's witnesses and to make his own argument to the jury. Counsel also deferred to defendant's wishes in the selection of mitigating evidence. Thus, defendant effectively had the advantages of self-representation. We are not persuaded that the presentation of the defense case would have been significantly different, much less more effective, had the trial court granted defendants motion for self-representation.

Defendant's claim is no more persuasive if considered under the rubric of conflict of interest. ■ A criminal defendant's right to effective assistance of counsel, guaranteed by both the state and federal Constitutions, includes the right to representation free from conflicts of interest. (*Wood* v. *Georgia* (1981) 450 U.S. 261, 271 [67 L.Ed.2d 220, 230, 101 S.Ct. 1097]; *People* v. *Jones* (1991) 53 Cal.3d 1115, 1134 [282 Cal.Rptr. 465, 811 P.2d 757].) To establish a violation of the right to unconflicted counsel under the federal Constitution, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." (*Cuyler* v. *Sullivan* (1980) 446 U.S. 335, 348 [64 L.Ed.2d 333, 346-347, 100 S.Ct. 1708], fn. omitted.) To establish a violation of the same right under our state Constitution, a defendant need only show that the record supports an "informed speculation" that counsel's representation of the defendant was adversely affected by the claimed conflict of interest. (*People* v. *Cox* (1991) 53 Cal.3d 618, 654 [280 Cal.Rptr. 692, 809 P.2d 351]; *Maxwell* v. *Superior Court* (1982) 30 Cal.3d 606, 612-613 [180 Cal.Rptr. 177, 639 P.2d 248, 18 A.L.R.4th 333].)

■ Here, defendant maintains that the record supports at least an informed speculation that counsels' opposition to his motion for self-representation was motivated, at least in part, by counsel's financial stake in preserving their court appointment as defendant's legal representatives. We disagree. Nothing in the record suggests that this particular appointment was financially important for counsel or that counsel could not have promptly obtained appointments representing other defendants. Moreover, defendant stated that if the court granted him self-representation he wanted to keep counsel in an advisory capacity. Thus, the record does not support an informed speculation that the defense attorneys perceived any threat to their

livelihoods, nor is there the slightest hint that thoughts of compensation, rather than sincere concern about protecting defendant's interest in avoiding a death judgment, in any way influenced their opposition to defendants motion for self-representation. We are satisfied there was no conflict of interest.

 We agree in principle, however, that defense counsel in criminal prosecutions should refrain from formally opposing their clients' motions for self-representation.[3] First, there is a serious question as to counsel's standing in this situation. Defense counsel's primary role is to represent the accused. When counsel oppose the client's own motion, either we have the anomaly of a motion made and opposed by the same party, or we have counsel stepping out of the assigned role as party representative. Second, permitting counsel to oppose a client's motion is likely to undermine the trust that is essential to an effective attorney-client relationship, and for this reason it will make subsequent representation more difficult in the event the motion for self-representation is denied. Third, "the defendant—not criminal defense counsel—has the right to personally decide whether he or she desires . . . to appeal, or to proceed pro se." (Burkoff, Criminal Defense Ethics (1993 rev. ed.) § 6.3(a)(2), p. 6-20, fns. omitted.)

This is not to say that defense counsel must suppress misgivings and actively support the motion for self-representation, or even that counsel must remain silent. Without formally opposing self-representation, counsel can assist the court and serve the clients best interests by advising the client of the risks and disadvantages of self-representation; by providing the trial court, upon request, with relevant nonprivileged information and pertinent legal authority; and by correcting any misstatement of fact by the client. (See *People* v. *Burton* (1989) 48 Cal.3d 843, 855-856 [258 Cal.Rptr. 184, 771 P.2d 1270] [counsel's response to defendant's motion to substitute counsel].) If defense counsel believes the client may lack competence to waive the assistance of counsel (see, e.g., *People* v. *Clark* (1992) 3 Cal.4th 41, 106 [10 Cal.Rptr.2d 554, 833 P.2d 561]; but see also *Godinez* v. *Moran* (1993) __ U.S. __, __ [125 L.Ed.2d 321, 331-333, 113 S.Ct. 2680, 2686-2687] [competency standard for waiving the right to counsel is the same as for standing trial]), counsel has a legal and ethical obligation to bring this matter to the trial court's attention. (See *People* v. *Harris* (1993) 14 Cal.App.4th 984, 995 [18 Cal.Rptr.2d 92].)

 We reject defendant's claim that his counsel's interference with his attempted exercise of the right of self-representation should result in reversal

---

[3]By comparison, counsel may properly oppose a represented defendant's efforts to participate in the presentation of the defense case. As we have explained, "the decision whether to proceed in that fashion is a matter of tactics for professional counsel to decide." (*People* v. *Hamilton, supra,* 48 Cal.3d 1142, 1163.)

of the judgment regardless of specific prejudice. Although denial of the constitutional right of self-representation requires this remedy (see *McKaskle v. Wiggins, supra,* 465 U.S. 168, 177, fn. 8 [79 L.Ed.2d 122, 133]; *People v. Joseph* (1983) 34 Cal.3d 936, 946 [196 Cal.Rptr. 339, 671 P.2d 843]), defendant waived his constitutional right of self-representation by failing to assert it within a reasonable time before trial. (*Jackson v. Ylst* (9th Cir. 1990) 921 F.2d 882, 888; *People v. Hardy, supra,* 2 Cal.4th 86, 193-194; *People v. Bloom, supra,* 48 Cal.3d 1194, 1220.) As we have explained, defendant cannot show specific prejudice because there is no reason to believe that the penalty defense would have been more effective, or even significantly different, had the court granted defendant's motion for self-representation.

## C. *Granting Motion for Cocounsel Status*

 Advancing alternative theories, defendant challenges the trial court's order granting him cocounsel status. The first theory assumes there is no constitutional right to self-representation at the penalty phase of a capital case and asserts that this principle also precludes granting the defendant cocounsel status. The second theory assumes the trial court has discretion to grant cocounsel status in a proper case but declares that the trial court abused its discretion in this case.

The first theory requires little discussion. Opinions of this court issued after the filing of defendant's opening brief on this appeal establish that the accused may act as cocounsel or waive counsel entirely at the penalty phase of a capital case. (*People v. Clark, supra,* 3 Cal.4th 41, 109; *People v. Clark, supra,* 50 Cal.3d 583, 617; *People v. Bloom, supra,* 48 Cal.3d 1194, 1218-1224.)

Defendant's alternative argument, that the ruling was an abuse of discretion, fares no better. This claim is barred by the doctrine of invited error, which estops a defendant from challenging a trial court ruling granting the defendant's own motion. (See *People v. Jones, supra,* 53 Cal.3d 1115, 1136; *People v. Lang* (1989) 49 Cal.3d 991, 1031-1032 [264 Cal.Rptr. 386, 782 P.2d 627].)

## D. *Advisements*

 Defendant contends the trial court erred in not adequately advising him, before granting his motion for cocounsel status, of the dangers of proceeding as cocounsel.

We will assume, without deciding, that granting defendant's motion for cocounsel status involved a waiver of the right to counsel,[4] so that it was important that defendant understand the risks of his chosen course of action. (See *People* v. *Jones, supra,* 53 Cal.3d 1115, 1141-1142.) As we have explained, even when a defendant seeks to dispense with counsel's assistance entirely, "[t]he test of a valid waiver of counsel is not whether specific warnings or advisements were given but whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." (*People* v. *Bloom, supra,* 48 Cal.3d 1194, 1225; accord, *People* v. *Pinholster, supra,* 1 Cal.4th 865, 928-929.)

Here, the trial court had advised defendant, in connection with his motion for self-representation, that the prosecutor was a skilled and experienced opponent, that defendant's lack of formal legal training would put him at a disadvantage, and that self-representation was almost always unwise. The record also shows that defendant was well aware of the nature and seriousness of the charges against him. Accordingly, we are satisfied that defendant was sufficiently aware of the dangers of acting as cocounsel. No more was required.

## IV. *Failure to Present Mitigating Evidence*

After defendant was granted cocounsel status, he stated for the record, at his attorneys' request, that he would not submit to a psychiatric examination and that he would not have his mother or any members of his family testify or be in any way involved in the trial. Defense counsel indicated they would respect defendant's wishes in these matters. As a result, the defense case in mitigation did not include expert testimony about defendant's mental condition, nor did it include testimony from any member of defendant's family. Defendant now contends that his trial counsel, by following defendant's directions in these matters, denied defendant his right to a fair trial and deprived him of effective assistance of counsel.

[4]Although the trial court formally denied defendant's motion for self-representation, an argument can be made that defendant actually represented himself at the penalty phase. He conducted all cross-examination of prosecution witnesses, argued his case to the jury, and appears to have substantially controlled the selection of mitigating evidence. But counsel also argued to the jury on defendant's behalf and may have retained some tactical control over presentation of the defense case. Given that a defendant cannot be both self-represented and represented by counsel at any given time (*People* v. *Hamilton, supra,* 48 Cal.3d 1142, 1162), a defendant who assumes self-representation has necessarily surrendered the right to representation by counsel, even though counsel remains available to assist the defendant in a subordinate role. Here, we find it unnecessary to resolve the ambiguity in the record as to whether such a surrender of the right to counsel took place during the penalty phase of this case.

As we have repeatedly explained, an attorney representing a defendant at the penalty phase of a capital case is not required to present potentially mitigating evidence over the defendant's objections. (*People* v. *Howard* (1992) 1 Cal.4th 1132, 1185 [5 Cal.Rptr.2d 268, 824 P.2d 1315]; *People* v. *Deere* (1991) 53 Cal.3d 705, 714-717 [280 Cal.Rptr. 424, 808 P.2d 1181]; *People* v. *Lang, supra*, 49 Cal.3d 991, 1031.) A defendant may choose to spare his or her relatives the ordeal of testifying in a capital trial. (*People* v. *Lang, supra*, at p. 1031.) Similarly, counsel need not attempt to obtain and present expert psychiatric testimony in the face of the defendant's refusal to cooperate. Finally, "a defendant who insists that mitigating evidence not be presented at the penalty phase is estopped from later claiming ineffective assistance based on counsel's acquiescence in his [or her] wishes." (*People* v. *Deere, supra*, at p. 717.)

V. *Dog Poisoning and Threatening Telephone Calls*

Defendant raises various contentions regarding the prosecution's penalty phase evidence, introduced over defense objection, that defendant had threatened to harm Shirley Johnson, her house, and her children; that he had administered poison to Johnson's two dogs, inducing temporary paralysis; and that he had made telephone calls to Johnson during which he threatened harm to her daughter. He maintains that administering poison to animals and threatening damage to the house are not within any statutory aggravating factor, that evidence of the annoying telephone calls should have been excluded under Evidence Code section 352 as being more prejudicial than probative, that admitting evidence of threats made by telephone but not threats made in person constitutes a denial of equal protection of law, that the trial court's instructions to the jury improperly permitted reliance on threats or injury to property as a circumstance in aggravation, and that the combined effect of these claimed errors requires reversal of the judgment of death.

A. *Admissibility Under Statutory Aggravating Factor*

One of the statutory factors that the jury must consider in determining penalty in a capital case is "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (§ 190.3, factor (b).) To be admissible under this factor, a threat to do violent injury must violate a penal statute and must be directed against a person or persons, not against property. (*People* v. *Phillips* (1985) 41 Cal.3d 29, 72 [222 Cal.Rptr. 127, 711 P.2d 423]; *People* v. *Boyd* (1985) 38 Cal.3d 762, 776 [215 Cal.Rptr. 1, 700 P.2d 782].) But when the prosecution has evidence of

conduct by the defendant that satisfies these statutory requirements, evidence of the surrounding circumstances is admissible to give context to the episode, even though the surrounding circumstances include other criminal activity that would not be admissible by itself. (*People* v. *Livaditis, supra*, 2 Cal.4th 759, 776-777.)

Here, the prosecution's evidence included threats by defendant to harm Johnson's daughter, and, as defendant concedes, these threats violated section 653m.[5] To give context to the threats, the prosecution properly introduced evidence of the entire "course of criminal activity" that included these threats, including the poisoning of the dogs and the threats of injury to property. (*People* v. *Cooper* (1991) 53 Cal.3d 771, 841 [281 Cal.Rptr. 90, 809 P.2d 865]; see also, *People* v. *Sully* (1991) 53 Cal.3d 1195, 1243 [283 Cal.Rptr. 144, 812 P.2d 163] [injury to animals]; *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1258-1261 [278 Cal.Rptr. 640, 805 P.2d 899] [injury to property].)

### B. *Evidence Code Section 352*

■ Evidence Code section 352 gives trial courts discretion to exclude evidence the probative value of which is "substantially outweighed" by the probability that admitting it will unduly prolong the proceeding, prejudice the opposing party, confuse the issues, or mislead the jury. To preserve a claim that a trial court abused its discretion in not excluding evidence under this section, a party must make a timely and specific objection when the evidence is offered. (Evid. Code, § 353, subd. (a); *People* v. *Morris* (1991) 53 Cal.3d 152, 205 [279 Cal.Rptr. 720, 807 P.2d 949].)

Contrary to defendant's assertion on appeal, the defense did not specifically object at trial that Shirley Johnson's testimony about the poisoning of her dogs probably would prolong the proceedings unduly, unfairly prejudice defendant, confuse the issues, or mislead the jury, or that any one or more of these negative consequences substantially outweighed the testimony's probative value. Instead, the record shows that after requesting and receiving an offer of proof, defense counsel objected "that this does not show any crime of violence" and that "it's just a lot of hearsay testimony that is not really probative." Although counsel's lack of express reference to Evidence Code section 352 is not itself fatal to defendant's claim, the stated basis of the objection was insufficient to alert the trial court that this provision was being

---

[5]Section 653m, as here relevant, provides: "Every person who, with intent to annoy, telephones another and . . . addresses to the other person any threat to inflict injury to the person . . . addressed or any member of his or her family, is guilty of a misdemeanor." (*Id.*, subd. (a).)

invoked. Rather, counsel's claim that the evidence did not show any crime of violence and was "not really probative" appears to be an objection for lack of relevance. Because there was no specific objection on the grounds set forth in Evidence Code section 352, the issue is not preserved for review.

## C. Equal Protection Claim

Invoking the principle that a capital punishment scheme must provide a " 'meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not' " (*Gregg* v. *Georgia* (1976) 428 U.S. 153, 188 [49 L.Ed.2d 859, 883, 96 S.Ct. 2909]), defendant argues that because California's capital punishment scheme permits the use of annoying telephone calls as an aggravating factor when the same threats administered in person could not be so employed,[6] it does not provide a meaningful basis for selecting the few cases in which the death penalty should be imposed, and therefore our death penalty scheme violates both the Eighth Amendment ban on cruel and unusual punishments and the Fourteenth Amendment guarantee of equal protection of the laws.

Defendant's argument is founded upon a mistaken understanding of the purpose of aggravating and mitigating circumstances in our death penalty scheme. As we have recently explained, our law uses the special circumstances enumerated in section 190.2 to circumscribe the class of persons eligible for the death penalty. (*People* v. *Bacigalupo* (1993) 6 Cal.4th 457, 467-470 [24 Cal.Rptr.2d 808, 862 P.2d 808].) The aggravating and mitigating circumstances specified in section 190.3 perform a different function. "A factor in aggravation . . . is simply a circumstance which may or may not affect one or more juror's moral, normative judgment regarding the appropriate penalty for a defendant who has been convicted of a death-eligible crime." (*People* v. *Pensinger, supra,* 52 Cal.3d 1210, 1261.) For this purpose, factor (b) of section 190.3 appropriately permits the trier of penalty to consider evidence of threats of violence only when those threats violate a penal statute.

## D. Jury Instructions

The trial court instructed the jury that before it could consider as an aggravating circumstance the evidence that defendant had made "threatening

---

[6]It is no longer the case, if it ever was, that threats of death or great bodily injury can be criminal acts only if made by telephone. Section 422, enacted in 1988, imposes criminal sanctions for this conduct without regard to how the threat is communicated. A previous version of section 422 was enacted in 1977 (see Stats. 1977, ch. 1146, § 1, pp. 3684-3685), but this court had declared it unconstitutionally vague before the events at issue is this case. (*People* v. *Mirmirani* (1981) 30 Cal.3d 375, 388 [178 Cal.Rptr. 792, 636 P.2d 1130].)

telephone calls" to Shirley Johnson and had "[a]dminister[ed] poison to animals," it was necessary that the jurors be satisfied beyond a reasonable doubt that defendant had committed "such criminal acts." To assist the jurors in making this determination, the court defined the crime of "threatening telephone calls" in these terms: "Every person who, with intent to annoy, telephones another and addresses to such other person any threat to inflict injury to the person or property of the person addressed or any member of his family, is guilty of a crime." Defendant maintains that these instructions improperly permitted the jury to consider threats to injure animals and other property as an aggravating circumstance.

We agree that the court should have modified the instructions to delete references to poisoning animals and threatening injury to property. As we have already noted, factor (b) of section 190.3 encompasses only those threats of violent injury that are directed against a person or persons. (*People* v. *Boyd*, *supra*, 38 Cal.3d 762, 776.) But we are satisfied that there is no reasonable possibility these instructional errors affected the penalty verdict. (*People* v. *Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].) The testimony regarding defendant's threats to damage Johnson's house and the nonfatal poisoning of the dogs was brief and unemotional, and it was properly admitted and properly considered to provide context to the threat to Shirley Johnson's daughter. The testimony was insubstantial in comparison to the testimony regarding the threats to Shirley Johnson's daughter, the evidence concerning the Jacob D. and Stephen T. incidents, and the evidence of the two capital murders. (See *People* v. *Pinholster*, *supra*, 1 Cal.4th 865, 962-963 [explaining why erroneous admission of nonviolent or noncriminal conduct is generally not prejudicial].) There is no reasonable possibility that the instructions permitting the jury to consider the dog poisoning and threats to property as separate circumstances in aggravation, rather than as providing context to the threat to the daughter, induced any juror to vote for death rather than life without possibility of parole.

## VI. *Victim Impact Argument*

■ During penalty phase argument to the jury, the prosecutor referred to the likely suffering of the friends and family members of the two persons defendant had killed.[7] Relying on the United States Supreme Court's decision in *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct.

---

[7]"To the extent that sympathy or pity is part of a defense argument, I would like to indicate that sympathy and pity in this case cuts both ways.

"There is sympathy and pity for the people involved in this case.

"There were two young men who were murdered. Those two young men were absolutely innocent individuals. They had hopes. They had dreams.

2529], defendant argues that the prosecutors statements violated his rights under the Eighth Amendment to the federal Constitution.

After defendant's opening brief was filed, the United States Supreme Court largely overruled *Booth v. Maryland, supra,* 482 U.S. 496 (*Payne v. Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597]), and this court has subsequently held that under state law the immediate effects of a capital crime on the victims family constitute a "circumstance[ ] of the crime" (§ 190.3, factor (a)) that the prosecutor may elicit and argue at the penalty phase of a capital trial (*People v. Edwards* (1991) 54 Cal.3d 787, 833-836 [1 Cal.Rptr.2d 696, 819 P.2d 436]). The argument need not be based upon specific testimony of the victim's family members describing their emotions; the prosecutor can urge the jury to draw reasonable inferences concerning the probable impact of the crime on the victim and the victim's family. (See, e.g., *People v. Montiel* (1993) 5 Cal.4th 877, 934-935 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; *People v. Sandoval* (1992) 4 Cal.4th 155, 190-191 [14 Cal.Rptr.2d 342, 841 P.2d 862]; *People v. Wrest* (1992) 3 Cal.4th 1088, 1107-1108 [13 Cal.Rptr.2d 511, 839 P.2d 1020]; *People v. Raley, supra,* 2 Cal.4th 870, 917.) Here, the prosecutor's argument was well within the boundaries of permissible victim impact argument set by this court. (See *People v. Howard, supra,* 1 Cal.4th 1132, 1190-1191.)

VII. *Failure to Define "Aggravating" and "Mitigating"*

During the first day of penalty phase deliberation, the jury sent the court a note requesting "the legal definitions for aggravating and mitigating circumstances as they apply to the instructions in making the determination

"One of them at the age of 16 really never had a chance to live, never had a chance to love, never really had a chance to fulfill what he wanted out of life. To the extent that you are asked to consider sympathy and pity, I would say, fine; but look at it both ways, at both sides. To the extent you are asked to consider sympathy or pity, look at who else was killed at the Taco Bell.

"It wasn't just Jim Falconio, it wasn't just Wayne Hunter who was killed there. It was their families.

"It is a very painful thing for me to do to have to call somebody's best friend, in the case of John Hess, and to talk about his best friend being killed.

"It was even more painful to call the mother of the child who was murdered. It is not something I like to do. I don't enjoy watching somebody suffer on the witness stand, somebody totally innocent up there on the witness stand; but to the extent that pity, to the extent that sympathy is going to enter into this case, I ask you to that extent consider both sides.

"I am sure Mrs. Falconio, I am a parent, most of you are too—

"[Defense objects; objection overruled.]

"As a parent dreams for her child, dreams of becoming a grandparent, these dreams were also killed at the Taco Bell as well as something she will have to live with for the rest of her life. That is something that will never go away."

of this sentence." After discussing the note with counsel and defendant, the trial court summoned the jury and responded to the note with these words: "You have been given all the legal definitions you need. All other words have their common definitions." Defendant contends the court committed prejudicial error in so responding.

This court has previously determined that "aggravating" and "mitigating" are commonly understood terms that the trial court need not define for the jury. (*People* v. *Johnson* (1993) 6 Cal.4th 1, 50 [23 Cal.Rptr.2d 593, 859 P.2d 673]; *People* v. *Wader, supra,* 5 Cal.4th 610, 659; *People* v. *Lang, supra,* 49 Cal.3d 991, 1036; *People* v. *Malone* (1988) 47 Cal.3d 1, 55 [252 Cal.Rptr. 525, 762 P.2d 1249].) Adhering to our previous determination, we reject defendant's contention.

VIII. *Penalty Determination Instruction*

The trial court instructed the jury on the penalty determination process in these words:

"After having heard and received all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the aggravating and mitigating circumstances upon which you have been instructed. [¶] If you conclude that the aggravating circumstances outweigh the mitigating circumstances you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole."

■■■ Defendant contends this instruction was erroneous because it implied that penalty determination was a mechanical process of deciding whether there were more bad than good things about defendant rather than determining which of the alternative punishments was more appropriate under all the relevant circumstances.

The challenged instruction is a pattern instruction (CALJIC former No. 8.84.2 (4th ed. 1979 rev.)) that closely tracks language found in section 190.3. In *People* v. *Brown* (1985) 40 Cal.3d 512, 541-544 [220 Cal.Rptr. 637, 709 P.2d 440], we held that the statutory language and instructions based upon that language did not unconstitutionally withdraw from the jury its discretion to select the appropriate penalty. We cautioned, however, that the instruction is potentially misleading in two respects. "First, the jury might erroneously infer that it could perform the balancing or weighing process in a mechanical fashion by comparing the number of factors in

aggravation with those in mitigation, or by an arbitrary assignment of weights to the factors. Second, the jury might fail to understand that a juror is not required to vote for the death penalty unless, as a result of the weighing process, the juror personally determines that death is the appropriate penalty under all the circumstances." (*People* v. *Hayes* (1990) 52 Cal.3d 577, 642 [276 Cal.Rptr. 874, 802 P.2d 376].) In pre-*Brown* cases like this one, in which the jury was instructed in the language of section 190.3, we examine the entire record of the penalty proceeding to assure that the jury was not misled to defendant's prejudice in either of these ways. (52 Cal.3d 642.)[8]

The jury was not misled into believing that the balancing or weighing process was to be performed in a mechanical fashion. In their arguments to the jury, neither the prosecution nor the defense suggested that the jurors could discharge their duties by merely counting the aggravating and mitigating factors to determine which predominated numerically, or by assigning weight to the factors in an arbitrary manner.[9] Rather, the arguments to the jury stressed that the jurors had discretion to decide what weight to assign to each of the factors shown by the evidence.

For example, the prosecutor argued that the special circumstance of robbery murder should be considered as aggravating, but "depending upon you as individuals and how you assess it, you will assess it as more or less aggravating as compared to other types of robbery-murder." The argument of defense counsel made the same point explicitly: "It is very important that you understand that in weighing these factors you and you alone decide what weight to give each factor, that is, it is emphatically not a question of mere numbers of how many aggravating and how many mitigating factors there are. Rather, you have to decide not only which factors are present, but how important each factor is."

Nor was the jury misled into believing that the weighing process could be divorced from a decision as to the appropriateness of the death penalty. The prosecutor repeatedly reminded the jury that the aim of the entire process was to determine "the appropriate and just penalty in this case." Defense counsel also referred frequently to the importance of focusing on whether death was an appropriate penalty in this case.

---

[8]We decline to decide whether this record review is still necessary after the United States Supreme Court's decisions in *Blystone* v. *Pennsylvania* (1990) 494 U.S. 299 [108 L.Ed.2d 255, 110 S.Ct. 1078] and *Boyde* v. *California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190]. (See *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1231, fn. 30 [275 Cal.Rptr. 729, 800 P.2d 1159].)

[9]At one point the prosecutor spoke of "adding" the aggravating circumstances, but immediately retracted the statement. ("It's simply a weighing process where you add up—not add up, but you consider the factors in aggravation against the factors in mitigation.")

We find nothing in the arguments of counsel, in the other instructions to the jury, or in any other part of the record that could have caused a reasonable juror to misapprehend the penalty determination process or the scope of the jury's discretion to determine penalty. There was no error under *People* v. *Brown, supra,* 40 Cal.3d 512.

## IX. *Failure to Reinstruct the Jury*

■ Defendant contends that the trial court erred in failing to repeat at the penalty phase the instructions it gave at the guilt phase regarding the presumption of innocence, the meaning of reasonable doubt, and the requirement that the verdicts reflect the individual opinions of each juror.

As we have explained, a reasonable juror would assume that "generic" instructions given at the guilt phase continue to apply at the penalty phase, and therefore it is not prejudicial error for the trial court to fail to reiterate those instructions. (*People* v. *Hawthorne* (1992) 4 Cal.4th 43, 73-74 [14 Cal.Rptr.2d 133, 841 P.2d 118]; *People* v. *Wharton* (1991) 53 Cal.3d 522, 600 [280 Cal.Rptr. 631, 809 P.2d 290]; *People* v. *Brown, supra,* 46 Cal.3d 432, 460.) And we have expressly rejected the contention that the trial court on its own initiative must reinstruct the jurors at the penalty phase on the presumption of innocence as applied to unadjudicated crimes offered as circumstances in aggravation. (*People* v. *Benson* (1990) 52 Cal.3d 754, 809-810 [276 Cal.Rptr. 827, 802 P.2d 330].)

## X. *Failure to Instruct on Jury Unanimity as to Unadjudicated Crimes*

Defendant contends the trial court erred in not instructing, on its own initiative, that the jury could consider evidence of unadjudicated crimes as an aggravating circumstance under factor (b) of section 190.3 only if the jurors unanimously agreed that defendant was guilty of those crimes.

As defendant acknowledges, we have rejected this contention many times. (See, e.g., *People* v. *Alcala* (1992) 4 Cal.4th 742, 809 [15 Cal.Rptr.2d 432, 842 P.2d 1192]; *People* v. *Johnson* (1992) 3 Cal.4th 1183, 1245 [14 Cal.Rptr.2d 702, 842 P.2d 1].) Defendant provides no persuasive reason to reconsider our determination of this issue.

## XI. *Evidence of Unadjudicated Crimes*

Recognizing that we have often held to the contrary, defendant contends that admitting evidence of unadjudicated crimes as circumstances in aggravation deprives a capital defendant of due process of law and imposes cruel

and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution. We adhere to our prior decisions on this point. (See, e.g., *People* v. *DeSantis, supra,* 2 Cal.4th 1198, 1251-1252; *People* v. *Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480].)

## XII. *Instruction Including Inapplicable Mitigating Factors*

Defendant urges us to reconsider previous holdings that it is not error for the trial court to list all statutory mitigating factors, including factors not applicable to the case being tried, when instructing the jury at the penalty phase. (See, e.g., *People* v. *Danielson* (1992) 3 Cal.4th 691, 718 [13 Cal.Rptr.2d 1, 838 P.2d 729]; *People* v. *Hardy, supra,* 2 Cal.4th 86, 203.) We decline to reconsider these decisions.

## XIII. *Denial of Motion to Modify Penalty*

Denying the automatic motion to modify penalty (§ 190.4, subd. (e)), the trial court gave this statement of reasons:

"After weighing all the evidence and after consideration of all the factors set forth in Penal Code Section 190.3, this court concludes and adjudges beyond a reasonable doubt, that the defendants aggravating circumstances far outweigh any mitigating circumstances.

"I have considered the circumstances of the crimes for which the defendant stands convicted and the existence of any special circumstances found to be true.

"The crimes of robbery and murder which took place on September 17, 1983 were particularly aggravating [*sic*].

"The evidence showed that the defendant, William Kirkpatrick, planned to rob the Taco Bell restaurant in Burbank and intended to leave no witnesses.

"Although Lyndel Wayne Hunter and James Falconio offered no resistance to the robbery, they were summarily removed to the closet of the restaurant and needlessly and senselessly murdered, one by one, execution style, shot in the head by a calculating, cold-blooded murderer.

"Mr. Falconio was only sixteen years old.

"The true amoral and cold-hearted character of William Kirkpatrick was obvious throughout the trial and perhaps most dramatically shown by his

statement to Cora Rand in reference to the condition of James Falconio, in which Kirkpatrick stated, 'I hope the damn kid dies.'

"The evidence presented by the People in the penalty phase showing the presence of criminal activity by the defendant which involved the use or attempted use of force or violence was aggravating beyond a reasonable doubt.

"The assault upon Stephen T[.], the threats to Mrs. Johnson's daughter, the poisoning of her dogs, and the sexual assault upon Jacob D[.], all proven beyond a reasonable doubt, are all aggravating circumstances.

"There was no evidence that the defendant was under the influence of extreme mental or emotional disturbance.

"The victims of those murders did not consent to nor were they participants in the defendant's homicidal conduct other than to be victims.

"There was not any moral justification nor any extenuation for the defendant's conduct, nor could he reasonably believe there was.

"The defendant did not act under extreme duress or under the substantial domination of another.

"There was no evidence that the defendant at the time of the offense had his capacity to appreciate the criminality of the conduct impaired as a result of mental disease or defect or the effects of intoxication.

"The evidence showed that the defendant was not a mere minor participant but was in fact the shooter.

"The only possible factors in mitigation are the lack of any prior felony convictions and the defendant's age of 23.

"There were no other circumstances which extenuate the gravity of the crime even though not a legal excuse.

"As I have stated earlier, the circumstances in aggravation far outweigh those in mitigation.

"The motion for modification of the verdict imposing the death penalty is denied."

After the denial of the modification motion, but before the court pronounced sentence, the court heard testimony from John Hess (a close friend

of victim Hunter) and Rose Falconio (the mother of victim Falconio). These witnesses expressed their opinions that defendant should be executed for his crimes.

■ Defendant contends that the trial court prejudicially erred in (1) relying upon evidence that defendant had poisoned Shirley Johnson's dogs, (2) ignoring evidence that defendant was intoxicated at the time of the crimes, and (3) receiving victim impact evidence.

As we have explained, evidence that defendant poisoned Shirley Johnson's dogs was properly admitted to provide context to defendant's threats against Johnson's daughter. Thus, the trial court properly considered it, and the trial court's brief reference to the incident does not indicate that the court gave it undue weight.

Under factor (h) of section 190.3, the penalty jury is to consider "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of . . . the affects [*sic*] of intoxication." Here, the trial court expressly found that defendant's "capacity to appreciate the criminality of the conduct" was not impaired by intoxication, but defendant complains that there was no similar finding that his capacity to "conform his conduct to the requirements of law" was unimpaired. The omission appears to be an oversight in an otherwise thorough review of the statutory factors, but the omission does not constitute error. The trial court's statement of reasons is sufficient to permit thoughtful and effective appellate review. No more is required. (*People* v. *Clark, supra*, 3 Cal.4th 41, 172.)

To the extent that defendant may be contending that the trial court was required to find that intoxication was a mitigating circumstance, we reject the contention. Evidence that defendant was intoxicated at the time of the murders was slight and unpersuasive. The trial court could properly find that defendant was not intoxicated. (See *People* v. *Thomas* (1992) 2 Cal.4th 489, 543-544 [7 Cal.Rptr.2d 199, 828 P.2d 101].)

Finally, there was no error or prejudice in the trial court's decision to permit testimony by a friend and a relative of the victims *after* the court had denied the motion to modify penalty. (*People* v. *Duncan* (1991) 53 Cal.3d 955, 981 [281 Cal.Rptr. 273, 810 P.2d 131]; *People* v. *Babbitt* (1988) 45 Cal.3d 660, 724-725 [248 Cal.Rptr. 69, 755 P.2d 253].)

## XIV. *Constitutional Challenge to Death Penalty Law*

 Defendant contends that the death penalty law unconstitutionally delegates to each district attorney the power to decide which defendants shall be sentenced to death by means of the prosecutors' decisions to charge or not to charge special circumstances and to seek or not to seek the death penalty in those cases in which special circumstances are charged and found. We disagree. As we have explained, "prosecutorial discretion to select those eligible cases in which the death penalty will actually be sought does not in and of itself evidence an arbitrary and capricious capital punishment system or offend principles of equal protection, due process, or cruel and/or unusual punishment." (*People* v. *Keenan* (1988) 46 Cal.3d 478, 505 [250 Cal.Rptr. 550, 758 P.2d 1081]; accord, *People* v. *Ashmus* (1991) 54 Cal.3d 932, 980 [2 Cal.Rptr.2d 112, 820 P.2d 214].) Similarly, we conclude that the death penalty law does not violate the constitutional principle of separation of powers by delegating sentencing authority to the prosecutor. Ultimate sentencing power remains at all times with the judicial branch.

DISPOSITION

The judgment is affirmed.

Lucas, C. J., Arabian, J., Baxter, J., George, J., and Klein, J.,* concurred.

**MOSK, J.**—I concur in the judgment. After review, I have found no reversible error or other defect.

I write separately, however, because I cannot concur in the majority opinion's discussion, or lack of discussion, of three troubling issues.

The first is defendant's claim of ineffective assistance under the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution, based on trial counsels' opposition to his penalty phase motion to exercise his Sixth Amendment right of self-representation under *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]. The majority's analysis leads ineluctably to a determination of no prejudice, based on the assertion that " 'the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome

---

*Presiding Justice, Court of Appeal, Second Appellate District, Division Three, assigned by the Acting Chairperson of the Judicial Council.

unfavorable to the defendant.'" (Maj. opn., *ante,* at p. 1009, quoting *McKaskle* v. *Wiggins* (1984) 465 U.S. 168, 177, fn. 8 [79 L.Ed.2d 122, 133, 104 S.Ct. 944].) But it is settled that a violation of this right by the trial court "is not amenable to 'harmless error' analysis" and for that reason "cannot be harmless . . . ." (*McKaskle* v. *Wiggins, supra,* 465 U.S. at p. 177, fn. 8 [79 L.Ed.2d at p. 133].) Is it true, as the majority imply, that a violation of this same right *by the defendant's own attorney* is virtually harmless per se? It may be that "defendant waived his [absolute] constitutional right of self-representation by failing to assert it within a reasonable time before trial." (Maj. opn., *ante,* at p. 1011.) But he still retained at least a *qualified* constitutional right of self-representation. The record reveals that he would most likely have been allowed to proceed pro se had not his attorneys expressed opposition.

The second troubling issue is defendant's claim that the trial court erred by refusing the jury's request during penalty deliberations for a definition of the crucial instructional terms "aggravating" and "mitigating." The majority's response is insufficient. It is true that "[t]his court has previously determined that 'aggravating' and 'mitigating' are commonly understood terms that the trial court need not define for the jury." (Maj. opn., *ante,* at p. 1018.) That determination is perhaps sound when the jury does not express any lack of such "common understanding." The matter is otherwise when —as here—it does. The cases cited by the majority cover the situation in which the jury does not make an expression of this sort. They do not extend further.

The third troubling issue is defendant's claim that Penal Code section 190.3, which governs the penalty phase of a capital trial, violates the guaranty of equal protection of the laws contained in the Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution by "allow[ing] proof of threats of violence as an aggravating circumstance where such threats are made over the telephone but not where they are otherwise communicated. In effect this creates two classifications of persons: one subject to aggravation at the death penalty trial because threats of violence were made over the telephone, and one not subject to aggravation based on violent threats made by some other means." "[W]hen reviewing legislative classifications under the equal protection clauses of the California and United States Constitutions, the legislation under examination is generally clothed in a presumption of constitutionality. However, once it is determined that the classification scheme affects a fundamental interest or right [or involves a suspect classification] the burden shifts; thereafter *the state* must first establish that it has a *compelling* interest

which justifies the law and then demonstrate that the distinctions drawn by the law are *necessary* to further that purpose." (*People* v. *Olivas* (1976) 17 Cal.3d 236, 251 [131 Cal.Rptr. 55, 551 P.2d 375], italics in original.) Obviously, the classification between "telephonic" and "nontelephonic" threats and threateners affects life itself. And life, of course, is the most fundamental of fundamental interests. (See *ibid.*) "[C]an the challenged sentencing scheme withstand application of the strict scrutiny standard?" (*Ibid.*) The majority do not even address the question.

But, with all that said, neither in these matters nor in any other can I find grounds for reversal. Hence, although I do not concur in the majority opinion, I do concur in the judgment.

Appellant's petition for a rehearing was denied August 11, 1994, and the opinion was modfied to read as printed above.