Filed 6/9/26  P. v. Carter CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H052267 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1652794) |
| v. | |
| THEODORE JAY CARTER, | |
| Defendant and Appellant. | |

Defendant Theodore Jay Carter was convicted by jury trial of sexual offenses against three minor victims.  The jury also found true the allegation that Carter had committed sexual acts against more than one victim.  The trial court sentenced Carter to a prison term of 105 years to life, consecutive to one year.

On appeal, Carter contends he was deprived of his constitutional right to the effective assistance of counsel because his trial counsel failed to (1) request a limiting instruction with respect to " 'fresh complaint' " evidence, (2) object to the introduction of certain fresh complaint testimony, and (3) object at trial to the introduction of one victim's testimony from the preliminary hearing.  Carter asserts these errors were individually and cumulatively prejudicial.

For the reasons explained below, we reject Carter's challenges and affirm the judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

*A. Procedural History*

In February 2024, the Santa Clara County District Attorney (district attorney) filed a fourth amended information (information) charging Carter with 15 counts of sexual crimes against minor siblings J. Doe, B. Doe, and A. Doe, on or about dates between November 2004 and September 2014.[1] The charges comprised three counts of oral copulation or sexual penetration of a child 10 years old or younger (Pen. Code,[2] § 288.7, subd. (b); counts 1, 4 & 6), eight counts of lewd act upon a child by force, violence, duress, menace, or fear (§ 288, subd. (b)(1); counts 2, 5, 7, 8, 11, 12, 13 & 14), one count of annoying or molesting a child (§ 647.6, subd. (a)(1); count 3), one count of lewd act on a child under 14 years of age (§ 288, subd. (a); count 9), one count of aggravated sexual assault of a child under age 14 and 10 or more years younger than Carter (§ 269; count 10), and one count of lewd act on a child aged 14 or 15 (§ 288, subd. (c)(1); count 15). The information also alleged as to counts 2, 5, 7, 8, 9, and 11 through 14, that the charged crimes were committed against more than one victim under section 667.61, subdivisions (b) and (e).

In March 2024, a jury found Carter guilty on counts 1, 2, 4, 5, 6, 7, 9, 10, 12, 13, and 15, guilty of the lesser offense of lewd act on a child under age

---

[1] The information identified the minor victims by first name and the pseudonym "Doe." We refer to the minors by the first initial of their first names and other persons by their initials (or the first two initials of their first name) to protect personal privacy interests. (See Cal. Rules of Court, rule 8.90(b)(4), (10)–(11).)

[2] All further unspecified statutory references are to the Penal Code.

14 (§ 288, subd. (a)) on counts 8, 11, and 14, and not guilty on count 3. The jury also found true the multiple-victim allegation as to counts 2, 5, 7, 8, 9, 11, 12, 13, and 14.

On May 28, 2024, the trial court sentenced Carter to an aggregate term of imprisonment of 105 years to life, consecutive to one year. The sentence comprised consecutive terms of 15 years to life on counts 1, 2, 4, 5, 6, 7, 10, 12 and 13, concurrent terms of 15 years to life on counts 8, 9, 11, and 14, and a determinate, mitigated term of 1 year on count 15. The court stayed the punishment on counts 1 and 6 pursuant to section 654.

*B. Evidence Presented at Trial*

A. Doe, B. Doe, and J. Doe are siblings. A. Doe is the eldest, J. Doe is in the middle, and B. Doe is the youngest. Carter is their paternal uncle. The siblings also have a brother, a younger sister, and two younger half-siblings.

During the sisters' childhood, the family experienced unstable housing and moved frequently. A. Doe, B. Doe, and J. Doe lived at times with their mother, with their father and paternal grandparents, in motels, and with family members including Carter, as well at times in their mother's vehicle. The siblings changed schools many times.

1. <u>Prosecution Case</u>

B. Doe, J. Doe, and A. Doe each testified, as did their mother, several middle school classmates of J. Doe's and B. Doe's, the high school counselor of J. Doe and B. Doe who contacted the police, and a clinical psychologist expert witness.

a. B. Doe (Counts 4–9)

B. Doe was born in September 2001 and was 22 years old at the time of trial. She lived in California with her family from 2001 until 2014 and moved frequently in and around Santa Clara County.

3

When B. Doe was five or six years old, she lived for a period with several family members, including Carter, in a hotel. Sometimes Carter would watch B. Doe and her siblings while other adults were out. Carter would play games with them, and B. Doe trusted him. The hotel was a single room hotel with a bathroom. Because the bathroom doubled as a space in which the family kept a rice cooker and stored things, the adults would enter the bathroom while the children were using it. They typically would not close the bathroom door when doing so.

The first time Carter molested B. Doe, he walked into the bathroom while B. Doe was sitting on the toilet with her pants down. Carter closed the door behind him. Carter told B. Doe they would play a game, and to close her eyes and open her mouth and guess which finger he was putting in her mouth. She felt nervous and did what he said. After starting with his fingers, he put his penis in her mouth. She could feel that it was not his fingers and was something different. She was "really scared." She "just sat there." At one point she opened her eyes and he was standing facing her with his hands on his hips and holding up his shirt. She could see his belly and feel the penis in her mouth.

The same thing occurred a second time while they were still living in the hotel. The second time, B. Doe kept her eyes closed. She remembers her siblings being in the hotel room when the molestations happened. B. Doe knew that she needed to listen to the adults in her life to avoid being disciplined, which meant being put in the corner or spanked by her parents. B. Doe also knew what Carter had done "wasn't supposed to happen" and felt embarrassed. She did not tell anyone.

Another incident occurred when B. Doe was seven years old and living with her mother and siblings in Santa Clara. B. Doe's mother would take her

4

and her siblings to visit their paternal grandmother, who lived with their uncle (Carter) in a nearby apartment. Sometimes the siblings would be left with Carter when their grandmother went out. Carter often played games, which the children enjoyed.

During a game of hide-and-seek, Carter told B. Doe that they were going to hide in his room. She was worried but complied. Carter told her to go into the closet, then put a blanket over her. She was seated on her knees and bottom with her back to the side wall of the closet. He sat in front of her facing her and closed the closet door. Carter told B. Doe to open her mouth. She felt "scared" and "knew that he was going to make [her] do something that [she] didn't want to do again." Carter grabbed the back of her head and pushed her head down onto his penis. He repeatedly pushed her head down, using greater force when she tried to resist and pull away, and telling her that he was not going to hurt her. Carter did this at least twice, and his tone became more aggressive. It ended when J. Doe (who was the seeker in the hide-and-seek game) tried entering the bedroom and asked why the door was locked. Carter told B. Doe not to tell anyone, then got up and unlocked the door. Afterward, B. Doe wanted to tell her family what happened but thought she was going to get into trouble. She did not tell anyone at that time.

Carter again molested B. Doe when she was nine or 10 years old and living at an apartment with her mother, her mother's partner, J. Doe, and her younger sister and half-sister. Carter drove the siblings to and from school and on errands. The children would play the "shotgun" game to determine who would ride in the front passenger seat. On three or four occasions, when B. Doe sat in the front seat, Carter reached his hand toward her and slid his fingers inside her pants and under her underwear. Carter

touched B. Doe skin to skin by stroking between her vaginal lips with his fingers. This lasted only for a few seconds because, each time, B. Doe moved away by scooting toward the passenger door. After he removed his hand from beneath her underwear, he would smell his hand. This happened each time he touched her in the car. B. Doe never told or tried to get her siblings' attention; she "just wanted it to be over and . . . acted like nothing ever happened."

Another incident occurred when B. Doe was in sixth grade. She and her friend L.S. spent the night at B. Doe's grandmother's home in Santa Clara, where Carter lived. B. Doe and L.S. were playing a videogame on Carter's PlayStation. L.S. was sitting on the floor facing the TV and B. Doe was sitting on the edge of the bed. Carter sat behind B. Doe and put his hand into her pants and "touched [her] butt" skin to skin. B. Doe immediately slid off the bed onto the floor next to L.S. Carter seemed "annoyed" when she moved away and was "breathing really hard."

B. Doe did not tell anyone about this or the other incidents until later in sixth grade when she told L.S. and her friend C.I., with whom she felt very close. B. Doe and C.I. were walking to school when B. Doe confided that her uncle (Carter) was touching her. Later that day, C.I. told J. Doe, who found B. Doe after class and told B. Doe that it had happened to her, too. B. Doe felt "relieved" that J. Doe found out but "also really sad" because J. Doe also had been abused.

J. Doe texted A. Doe, who was in high school, about their uncle, but A. Doe "didn't really answer" their questions and just told them it would be okay. Based on her response, B. Doe suspected that something also had happened to A. Doe. She hoped J. Doe or A. Doe would tell an adult, though neither did. B. Doe felt "scared and worried" because she had little sisters,

6

whom she tried to not leave alone with Carter. B. Doe moved to Texas later that year during the spring break of 2014.

In September 2016, during ninth grade, B. Doe disclosed Carter's molestation with the support of her school counselor. In response, her father's family "disowned" her and her siblings, called them liars, and their father told B. Doe and her sisters to kill themselves.

b. J. Doe (Counts 1–3)

J. Doe was born in June 2000 and was 23 years old at the time of trial. J. Doe felt "[d]isgusted" by Carter because of what he did to her and her sisters.

When J. Doe was seven or eight years old and living in San Jose or Santa Clara, Carter asked her if she wanted a candy or lollipop, then picked her up and carried her from the living room to a bedroom. Carter removed J. Doe's pants and underwear and inserted a finger inside her vagina. It was "[v]ery uncomfortable" and J. Doe felt "[s]cared" and "nervous." Carter then went to the bathroom and washed his hands.

Another incident occurred when J. Doe was 12 years old. J. Doe was staying at her paternal grandmother's home and was getting ready to take a shower. Before she went to the shower, Carter told her that he needed to use the restroom. After he finished, she entered the restroom, removed her clothes, and showered. When she got out of the shower, she noticed his phone propped up and facing the shower like it had been recording her. She picked up the phone to try to see if it was recording but put it down right away because she was afraid that he would see she had taken his phone. No one else was home. J. Doe felt she had to obey Carter because he was her elder. J. Doe later told her friend K.R. about finding the phone.

7

J. Doe also confided in her middle school classmate, C.I. J. Doe and C.I. were classmates, and C.I. was also B. Doe's friend. One day during class, C.I. told J. Doe what B. Doe had shared about their uncle, and J. Doe understood that B. Doe had gone "through something similar." J. Doe waited for the bell and ran to B. Doe and told her the same thing happened to her. They cried together but did not share details.

J. Doe eventually told her high school counselor in Texas, Stephanie Bennett, that her uncle had touched her and her sisters inappropriately. She and her sisters were questioned by the police. J. Doe felt anxious and overwhelmed. Disclosing the abuse "caused a lot more pain than [J. Doe] thought it would." The girls' mother tried to commit suicide after she found out.

J. Doe testified that she has "a very bad memory" and "can't remember a lot of things." She suffers from anxiety. J. Doe has a history of cutting herself.

### c. A. Doe (Counts 10–15)

A. Doe was born in November 1997 and was 26 years old at the time of trial.

Carter molested A. Doe when she was six or seven years old, attending second grade, and living with her parents. She and Carter were in a bedroom. Carter was seated at the foot of the bed and had her sit on the floor between his legs. Carter was unclothed from the waist down. His penis was exposed. He grabbed the back of A. Doe's head and pushed it toward his penis, forcing her to put his penis in her mouth. He referred to his penis as a "lollipop." A. Doe tried to resist by pulling her head back, and he pushed her head toward his penis again. Carter was moving her head back and forth

8

with his penis in her mouth. A. Doe could not say how many times her head went back and forth and did not recall how the incident ended.

Later, when she was "[n]ine turning [10]" and attending fifth grade, A. Doe lived in an apartment with her siblings, their paternal grandmother and her partner, an aunt, Carter, and another uncle. Living with Carter was "confusing and gross" because he would do things that are not what "you should be doing to little kids."

One time, Carter came up behind A. Doe while she was washing dishes and pressed the front of his body against her back to where she could feel his penis against her behind. Carter moved slightly side to side, rubbing his penis against her. His penis felt hard. It felt "[g]ross and uncomfortable." She told him that "he had a girlfriend and this was weird." He seemed surprised and did not respond.

Another time, while living in the same apartment and still in the fifth grade, Carter instructed A. Doe to go take a nap in her aunt's room. This was something Carter frequently told her to do, and A. Doe did what she was told because the kids "were supposed to listen to the adults." However, she did not sleep but only lay down and pretended to sleep. Carter came into the bedroom and lay on top of A. Doe. She could feel his penis on top of her backside, and she felt scared and uncomfortable not knowing what was going to happen.[3] They were both clothed. He was wearing loose basketball shorts. He rubbed his penis against her from side to side, like he had in front of the sink. His penis did not feel hard. This type of touching happened a few times.

---

[3] The prosecutor later moved to read into the record a portion of A. Doe's preliminary hearing testimony regarding this incident. We discuss this testimony in our analysis, *post* (pt. II.C.1.).

9

A. Doe later moved with her dad and his girlfriend, her siblings, her paternal grandfather, and Carter to a one-bedroom residence. There was a narrow hallway between the bathroom and bedroom, with insufficient space for two people to pass side by side. A. Doe was passing through the narrow area when Carter was also there. When she tried to walk past him, he put his hand on her stomach and under her shirt. He reached down her pants and inside the top of her underwear to the top of her pubic area but did not touch her vagina. A. Doe could not recall how the incident ended. They moved out of the house before the seventh grade.

When A. Doe started high school, she moved into an apartment with her mom and siblings and her mom's partner but continued seeing Carter, as they would often spend weekends with their dad and paternal grandmother. One more incident happened during this period when she was 14 or 15 years old, on a weekend visit with her siblings to their grandmother's apartment. They were all play-wrestling when Carter slipped his hand through the top of her shirt and into her bra, grabbed her breast, touched her nipple, and squeezed. She "got extremely angry" and sat up on the floor. She believed Carter's action was intentional and not part of wrestling. He asked her why she was mad and she did not respond.

A. Doe did not tell anyone at the time about these incidents because she worried that her mother and father would accuse her of lying, and the touching would keep happening anyway. The first person she told was a boyfriend.

A. Doe was 17 years old, in high school, when she moved to Texas to be with her mom and siblings. She wanted to leave California to get away from Carter. Although around that time her sisters told her that Carter had done something to them, she did not ask them questions or share her experience.

10

She was "shocked" because she "always thought that at least that if it was happening to [her], it wasn't happening to them." A. Doe did not tell an adult what happened to her until her sisters reported Carter's actions to the school counselor in Texas.

### d. Fresh Complaint[4] Witnesses

C.I. grew up in Sunnyvale and was friends with J. Doe as well as B. Doe. C.I. and J. Doe are the same age. The girls hung out, walked to and from their middle school, and were close friends. J. Doe first told C.I. that her uncle "would, like, do things that he wasn't supposed to do." J. Doe did not give specific details to C.I. B. Doe also told C.I. "it was her uncle" but did not provide details. C.I. testified, "They just told me that their uncle was doing stuff to them." They were "hurt and sad," and C.I. tried to show them she was there for them.

L.S. testified that she recalled sleepovers with B. Doe at the Santa Clara house and Carter, whom she knew as B. Doe's uncle, being present. At some point after that, B. Doe told L.S. that her uncle was touching her. L.S. did not know who to go to or what to do so she "just kept it to [her]self."

K.R. was a close friend and classmate of J. Doe's in middle school. J. Doe told K.R. that she found her uncle's phone in the bathroom and that she thought it was recording her while she was taking a shower. K.R. did not know what to do and did not tell anyone but just tried to offer her friendship as support.

---

[4] We acknowledge that the Court of Appeal in *People v. Flores* (2024) 101 Cal.App.5th 438, recently "encourage[d] California courts and commentators to abandon the 'fresh complaint' misnomer and refer to this evidentiary rule more accurately as the 'prior disclosure' doctrine." (*Id.*, at p. 443.) Nevertheless, for consistency with the parties' briefing and prior case law, we use the phrase "fresh complaint."

11

Stephanie Bennett is a student and family advocate—providing mental health assessments and support for students and families—in the school district where J. Doe and B. Doe attended high school in Amarillo, Texas. J. Doe disclosed to Bennett that an uncle in California "did some things to her sexually." She described to Bennett the incident in which her uncle asked J. Doe if she wanted a lollipop, then picked her up and carried her to a room in the home and digitally penetrated her. J. Doe also told Bennett about a time when her uncle set up a phone and filmed her while she was in the shower. J. Doe told Bennett that something similar happened to her sisters, specifically B. Doe. J. Doe appeared "[v]ery upset, tearful" and was "shaking and [had] a hard time speaking" as she spoke to Bennett.

Bennett is a mandated reporter. She immediately notified the school's police liaison officers who separately interviewed both girls. Bennett was present for the interviews. J. Doe's demeanor was "[t]earful. Quiet but answered – but cooperative." Bennett stated that when B. Doe was brought to meet with the liaison officers, she was "[c]rying and withdrawn," making "[l]ittle to no eye contact," and refusing to speak. Bennett understood that a subsequent interview was later set up with B. Doe.

### 2. Defense Case

Carter's sister, mother, and mother's boyfriend testified in his defense. Carter's younger half-sister De. testified that A. Doe, J. Doe, and B. Doe came to live with their grandmother (De.'s mother) from approximately 2005 to 2008. De. never saw Carter treat the girls in an inappropriate way sexually; he was affectionate and caring. Her experience with the three sisters included that they could tell lies as is typical for children, and that none of them ever expressed or exhibited problems with Carter.

12

Carter's mother, the girls' paternal grandmother, took physical custody of the sisters and their siblings for a period of time. She testified that Carter was a good uncle to the children but did not see them much because he was working or going out. She did not recall Carter being left alone to babysit the children, though he occasionally drove them to and from school.

## II. DISCUSSION

Carter contends that his defense counsel rendered constitutionally ineffective assistance under the federal and state constitutions by failing to (1) request a limiting instruction with respect to fresh complaint testimony, (2) object to the scope of certain witness testimony under the fresh complaint doctrine, and (3) object to the introduction at trial of some of A. Doe's preliminary hearing testimony. Carter also asserts that the cumulative prejudice from these errors requires reversal of the judgment.

### A. Ineffective Assistance of Counsel: Legal Principles

"A criminal defendant's federal and state constitutional rights to counsel (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15) includes the right to effective legal assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*), italics omitted.) "To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.'" (*People v. Hoyt* (2020) 8 Cal.5th 892, 958; see also *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) We can reject the claim on either element of the standard. (*Strickland,* at p. 687;

13

*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1008, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

"It is the defendant's burden to demonstrate the inadequacy of trial counsel. We defer to counsel's reasonable tactical decisions and indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*People v. Anzalone* (2006) 141 Cal.App.4th 380, 394; see *Mai, supra,* 57 Cal.4th at p. 1009.) "Representation does not become deficient for failing to make meritless objections." (*People v. Ochoa* (1998) 19 Cal.4th 353, 463; see also *People v. Bradley* (2012) 208 Cal.App.4th 64, 90.) Likewise, "[c]ounsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile." (*People v. Price* (1991) 1 Cal.4th 324, 387 (*Price*).)

"It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Mai, supra,* 57 Cal.4th at p. 1009.) Stated differently, when the record sheds no light on defense counsel's act or omission, " 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' " (*People v. Huggins* (2006) 38 Cal.4th 175, 206 (*Huggins*).)

14

*B. Fresh Complaint Evidence*

    1.  <u>Additional Background</u>

The district attorney moved in limine to admit evidence of the disclosures by J. Doe and B. Doe to several friends and their high school counselor about Carter's conduct. The district attorney argued that evidence of a sexual assault victim's disclosure to a third party is admissible for a limited, non-hearsay purpose under the standard articulated in *People v. Brown* (1994) 8 Cal.4th 746 (*Brown*). Applying that standard, the district attorney sought to admit evidence of J. Doe's disclosures to Bennett and to her friend K.R., and B. Doe's disclosures to C.I. and L.S.

Carter's counsel generally objected to the admission of the evidence because there was "significant delay in the reporting of the conduct," which counsel maintained brought the disclosures outside of the fresh complaint doctrine. The trial court rejected that argument. The court noted the evidence would not be admitted for the truth but "would include details of the general nature of the conduct, the timing of that disclosure, and the name of the perpetrator." The court ruled that it would allow the proffered testimony and would "instruct the jury that those statements are not to be taken for the truth but are under the fresh-complaint doctrine."

C.I., L.S., K.R., and Bennett each testified for the prosecution as summarized *ante* (pt. I.B.1.d.). During C.I.'s testimony, defense counsel objected on hearsay grounds to C.I. recounting what B. Doe told her about what "happened with [B. Doe's] uncle." The trial court overruled the objection and told the jurors that they "will also receive an instruction on how to treat this testimony." The court similarly informed the jury, after C.I.'s and L.S.'s testimonies were completed, that "the last two witnesses are what

15

the law calls fresh-complaint witnesses.  I will give you instructions on how to treat their testimony at the end."

Following the close of evidence, the trial court instructed the jury, and both sides presented closing arguments.  Outside the presence of the jury and prior to the defense's closing arguments, the court noted that it did "not see the fresh complaint witness jury instruction."  The prosecutor responded that she was "not sure" and could "take a look if that [*sic*] was one."  The court added, "My recollection is, maybe I am wrong, but there is an instruction for them on how to treat the fresh complaint not as for the truth, but as to the timing."  Defense counsel did not comment on this issue or request a jury instruction on the fresh complaint evidence.

2. Applicable Law

"Historically, under the common law fresh-complaint doctrine, evidence that the alleged victim of a sexual offense disclosed or reported the incident to another person shortly after its occurrence has been held admissible . . . in a subsequent criminal prosecution for that offense." (*Brown*, *supra*, 8 Cal.4th at p. 748.)  In 1994, the California Supreme Court in *Brown* clarified the doctrine's modern application. (*Id*. at p. 758.)

Under *Brown*, "the timing of a complaint (e.g., whether it was made promptly after the incident or, rather, at a later date) and the circumstances under which it was made (e.g., whether it was volunteered spontaneously or, instead, was made only in response to the inquiry of another person) are not necessarily determinative of the admissibility of evidence of the complaint." (*Brown*, *supra*, 8 Cal.4th at p. 750.)  Instead, "evidence of the fact of, and the circumstances surrounding, an alleged victim's disclosure of the offense may be admitted in a criminal trial for nonhearsay purposes under generally

16

applicable evidentiary principles, provided the evidence meets the ordinary standard of relevance.  (Evid. Code, § 210.)"  (*Id*. at p. 763.)

Evidence admitted under the fresh complaint doctrine is thus "admitted for the limited purpose of showing that a complaint was made by the victim, and not for the truth of the matter stated."  (*People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1522 (*Ramirez*); see *Brown*, *supra*, 8 Cal.4th at p. 761.)  "Evidence admitted pursuant to this doctrine may be considered by the trier of fact for the purpose of corroborating the victim's testimony, but not to prove the occurrence of the crime."  (*Ramirez*, at p. 1522.)

"On request, the trial court must instruct the jury as to the limited purpose for which the fresh complaint evidence was admitted.  [Citation.]  However, the trial court has no duty to give such an instruction in the absence of a request."  (*People v. Manning* (2008) 165 Cal.App.4th 870, 880 (*Manning*); see Evid. Code, § 355; *People v. Simms* (1970) 10 Cal.App.3d 299, 311.)

3. Analysis

Carter contends his counsel's performance with respect to the admission of fresh complaint evidence was deficient in two ways.  He maintains that a reasonably competent attorney would have investigated the use of fresh complaint evidence permissible under *Brown* and understood that the trial court has no sua sponte duty to give a limiting instruction absent a defense request, thus requiring him to request a limiting instruction on the fresh complaint testimony.  Carter further asserts that a reasonably competent attorney would have objected that the testimony of K.R. and Bennett exceeded the scope of permissible fresh complaint evidence under *Brown*.

17

We address each contention under the principles applicable to Carter's ineffective assistance of counsel claim. There is no dispute that Carter was entitled under *Brown* and the circumstances of this case (i.e., the evidence adduced by the prosecution) to seek a limiting instruction from the trial court. The limiting instruction would have directed the jury to consider the testimony regarding J. Doe's and B. Doe's disclosures "only for the purpose of establishing that a complaint was made, so as to dispel any erroneous inference that the victim was silent, but not as proof of the truth of the content of the victim's statement." (*Brown, supra*, 8 Cal.4th at p. 757.) The trial court's statements pretrial and during the prosecution's case suggest that the court anticipated providing such an instruction.

Carter contends that because the trial court "had been signaling throughout trial" that it intended to give such a limiting instruction, there can be no reasonable tactical justification for counsel's failure to request it.

We agree that given the clear precedent for obtaining upon request a limiting instruction on the use of fresh complaint evidence, this is not a situation in which defense counsel might have reasonably determined that making the request would have been futile. (Cf. *Price, supra*, 1 Cal.4th at p. 387.)

Nevertheless, Carter has not demonstrated that defense counsel's failure to request the limiting instruction fell below an objective standard of reasonableness under prevailing professional norms. (*Strickland, supra*, 466 U.S. at p. 687.) Even assuming the record on appeal discloses no rational tactical purpose for the omission, we will not reverse a conviction for ineffective assistance unless "there simply could be no satisfactory explanation" for counsel's omission. (*Mai, supra*, 57 Cal.4th at p. 1009.)

18

The trial record in this case contained detailed testimony by each of the three victims as to the nature and time frame of sexual acts Carter perpetrated on them, as well as the timing and reasons for each of their eventual disclosures. The testimony of C.I. and L.S. corroborated B. Doe's testimony about the timing of her disclosures to two friends during middle school. C.I.'s testimony further corroborated that both sisters disclosed to her during that period. The testimony of K.R. corroborated J. Doe's testimony about the circumstances and timing of her disclosure about finding Carter's phone in the bathroom. So, too, Bennett's testimony regarding the circumstances of J. Doe's disclosure and nature of the acts described by her were consistent with J. Doe's recounting.

Even with a limiting instruction, the jury would have been properly able to consider that these witnesses' testimony corroborated the timeline of abuse testified by B. Doe and J. Doe. Defense counsel may have made the tactical decision not to request a limiting instruction as to the fresh complaint evidence to avoid drawing further attention to the evidence. (See, e.g., *People v. Hinton* (2006) 37 Cal.4th 839, 878 [concluding failure to request limiting instruction on prior conviction was not ineffective assistance of counsel because "counsel may have deemed it unwise to call further attention to it"]; *People v. Stewart* (2004) 33 Cal.4th 425, 509 (*Stewart*) [rejecting ineffective assistance claim where counsel may have wished to avoid highlighting a matter "unfavorable to the defendant"]; *Huggins, supra*, 38 Cal.4th at p. 206 [deciding "counsel could have preferred not to draw the jurors' attention to particular comments by the prosecutor by objecting to them"].) Moreover, the question of "whether to seek a limiting instruction is a tactical decision properly left to defense counsel." (*People v. Griggs* (2003) 110 Cal.App.4th 1137, 1141 (*Griggs*).)

19

While there seems to be little doubt the trial court would have granted a request by Carter for a limiting instruction (Evid. Code, § 355), that fact does not preclude the possibility of reasonable defense counsel deciding that the risk of a limiting instruction (drawing further attention to the corroborative details of J. Doe's and B. Doe's disclosures) outweighed the likely benefits such an instruction would provide. (See *Griggs*, *supra*, 110 Cal.App.4th at p. 1141.)

This explanation appears even more likely when considering that defense counsel failed to request a limiting instruction even after the trial court observed that the jury instructions contained no "fresh complaint witness jury instruction." The court's comment to counsel took place outside the presence of the jury, after the jury was instructed and after the prosecutor's closing argument, but before defense counsel's closing argument and jury deliberation. At that point in the proceedings, the jury had been instructed pursuant to CALCRIM No. 303 that "[d]uring the trial, certain evidence was admitted for a limited purpose" and "[y]ou may consider that evidence only for that purpose and for no other." Furthermore, the prosecutor had referenced the fresh complaint testimony and its limited use in her closing argument, reminding the jury that they "heard from three witnesses" (C.I., L.S., and K.R.) and stating that while the jury could not use what the sisters told their friends as "proof beyond a reasonable doubt," they could consider the fact that the sisters told someone "close to the time it was happening" and the circumstances in which they told.

While the jury had also been instructed pursuant to CALCRIM No. 200 not to treat attorney comments as the law, defense counsel could have made the tactical decision to neither draw further attention to the evidence nor to the potential ways it *could* use that evidence as corroboration for the victims'

20

testimony.  (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1053 [rejecting ineffective assistance claim where "defense counsel might reasonably have concluded it best if the court did not explain how the evidence could be used," and an instruction limiting the use of testimony "might explain how it *could* be used as well as how it could not be used"].)

For these reasons, we cannot conclude on the record before us that there simply could be no satisfactory explanation for defense counsel's failure to request a limiting instruction under *Brown* regarding the fresh complaint evidence.  (See *Mai, supra*, 57 Cal.4th at p. 1009.)  Therefore, Carter has not demonstrated his trial counsel was constitutionally ineffective for failing to do so.

Turning to the scope of the testimony, Carter contends defense counsel was deficient for failing to object when K.R. and Bennett exceeded the scope of permissible fresh complaint evidence under *Brown*.  Specifically, Carter cites K.R.'s testimony concerning not only the circumstances surrounding J. Doe's disclosure but "the specifics of the shower incident that [J. Doe] had relayed to her," including that " 'she noticed that her uncle's phone was, like, in the bathroom, set up in the bathroom when – before she got into the shower.  And . . . she thought that it was recording.' "  Carter additionally maintains that Bennett's testimony "went even further in providing impermissible details than [K.R.]'s testimony."  Specifically, Bennett testified regarding what J. Doe told her about the nature of the abuse, stating "when she was home alone with him, that he asked her if she wanted a lollipop and picked her up and carried her to a room in the home and turned her around and put his fingers in the lower part of her body.  And [J. Doe] also described a time of him setting up a phone while she was in the shower and filming her."

21

Under *Brown*, "evidence of the victim's report or disclosure of the alleged offense should be limited to the fact of the making of the complaint and other circumstances material to this limited purpose." (*Brown*, *supra*, 8 Cal.4th at p. 763.) The court in *Brown* explained that the minor victim's eventual disclosure of sexual assault by her mother's boyfriend came within the permissible "limits . . . governing the admissibility of such statements" (*id.* at p. 764) because the prosecutor adduced testimony of "the context and circumstances surrounding the disclosure" and did not "refer directly to the incidents of molestation." (*Ibid.*) The court observed that the testimony omitted "the content of the [child's] statements and specifically any description of the molestation itself." (*Ibid.*)

Carter argues that the details provided in each of these testimonies exceeded the limit set by *Brown* because they stated not only the " 'fact of the complaint' or related circumstances, but the actual details of the offense." (Citing *Brown*, *supra*, 8 Cal.4th at p. 755.) The Attorney General counters that although the record on appeal does not shed light on any tactical reason for the failure to object to the scope of testimony, the record does not preclude a plausible, tactical reason for counsel's alleged omission.

We need not determine whether Carter's defense counsel's conduct fell below an objective standard of reasonableness under prevailing professional norms because we decide Carter has not carried his burden of demonstrating prejudice.

To prevail on his claim of ineffective assistance of counsel, Carter must show not just that counsel's failure "had some conceivable effect on the outcome of the proceeding, but that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

22

have been different.' " (*In re Edward S.* (2009) 173 Cal.App.4th 387, 418 (*Edward S.*), quoting *Strickland, supra,* 466 U.S. at pp. 693–694.)

Carter contends this was "a close case" because the prosecution relied primarily upon the credibility of the three complaining witnesses and five fresh complaint witnesses, and there were "no witnesses to the alleged incidents, no physical evidence of abuse, and no documentary evidence to corroborate the complaining witnesses' testimony." Carter asserts that other aspects of the case also establish it was close, including the jury's request for readbacks of certain testimony of J. Doe, B. Doe, and A. Doe, and that the jury acquitted Carter on count 3 (concerning the alleged recording of J. Doe in the bathroom) and found him not guilty on counts 8, 11, and 14, but of the lesser charges on those counts. Carter argues that, because the case was close, defense counsel's error undermines confidence in the jury's guilty verdicts, requiring reversal of his convictions.

There is general support in case law for the notion that a case that depends almost entirely on competing witness credibility is a "close" case. (See, e.g., *Edward S., supra,* 173 Cal.App.4th at p. 418; *People v. Taylor* (1986) 180 Cal.App.3d 622, 633–634.) Carter cites *People v. Centeno* (2014) 60 Cal.4th 659 for this proposition. In that case, the California Supreme Court reversed the defendant's conviction after a jury trial of two counts of a lewd act on a child under the age of 14, and one misdemeanor count of annoying or molesting a child under the age of 18, after concluding that certain actions by the prosecutor "unduly risked misleading the jury about the standard of proof." (*Centeno,* at p. 662.) In assessing prejudice arising from the defense counsel's failure to object to the prosecutor's misleading conduct, our high court stated the case was "very close," as the Attorney General had conceded. (*Id.* at p. 677.) Among other factors, the court noted

23

the prosecution "depended almost entirely" on the credibility of the single victim, who "did not voluntarily report the alleged touching," "provided very few corroborating details," "repeatedly and emphatically" denied the allegations at trial, and admitted she found many of the prosecutor's questions confusing. (*Ibid.*)

This case bears little resemblance to *Centeno*. Here, three victims independently and coherently testified to a range of similar conduct by Carter during an overlapping period of years and gave substantial corroborating details based on where the incidents occurred, who was present in the household, specifics of the molestation, and when and under what circumstances each of them eventually disclosed the abuse. Considering the totality of the evidence, the gaps in recollection and minor inconsistencies (i.e., regarding B. Doe's disclosure to C.I.) cited by Carter are insubstantial.

Moreover, the testimony of fresh complaint witnesses K.R. and Bennett was relatively brief, and the details presented therein were contained in the firsthand accounts provided by J. Doe and B. Doe. The jury "did not have to rely on [their] secondhand statements to other people, but was able to hear her directly and judge [their] credibility." (*Manning*, *supra*, 165 Cal.App.4th at p. 881.) Thus, any effect on the jury was cumulative. Further, as the jury did not request readback of any fresh complaint testimony, there is nothing in the record to suggest the jury placed any significant weight on that evidence. We therefore conclude it is not reasonably probable a different result would have been reached had Carter's defense counsel objected to limit the scope of the testimony. (*Ibid.*; see also *Ramirez*, *supra*, 143 Cal.App.4th at p. 1526.)

In sum, we decide that Carter has not demonstrated he received constitutionally ineffective assistance of counsel with respect to the fresh

complaint evidence based on the failure to request a limiting instruction or object to the scope of K.R.'s and Bennett's fresh complaint testimony.

## C. Preliminary Hearing Testimony

### 1. Additional Background

A. Doe testified about an incident when she was in the fifth grade and Carter sent her to her aunt's bedroom to nap. As she pretended to sleep, Carter came into the bedroom, lay on top of her where she could feel his penis on her backside, and rubbed himself on her from side to side. She did not recall if his full body was on top of hers, only that she could feel his penis "on [her] butt." Upon additional questioning by the prosecutor, A. Doe agreed that at the preliminary hearing, she previously testified "that [Carter's] chest and stomach were on [her] back and . . . his lower half was lined up with [her] lower half." A. Doe believed her memory as to what happened was a little better at the preliminary hearing.

Outside the presence of the jury, the prosecutor sought to read into the record the portion of A. Doe's preliminary hearing testimony in which she described "the defendant's position on her body during a nap incident." The trial court permitted the reading, over defense counsel's objection, as a "past recollection recorded."

The prosecutor read the following excerpt into the record before the jury: " '[Q.] Could you feel any part of his body on your body— [¶] [A.] Yes. [¶] [Q.] —[W]hen he was lying on top of you? [¶] [A.] Yes. [¶] [Q.] And what could you feel? [¶] [A.] Well, his chest and his stomach were on my back, and the lower half of his body was on my butt. [¶] [Q.] Could you feel anything from the lower half of his body on your butt? [¶] [A.] Yes. [¶] [Q.] What could you feel? [¶] [A.] His penis.' " Defense counsel did not reassert his objection after the prosecutor read this prior testimony.

## 2. Applicable Law

Hearsay, which may be understood as an out-of-court statement offered for the truth of its content, "is generally inadmissible unless it falls under an exception." (*People v. Sanchez* (2016) 63 Cal.4th 665, 674, citing Evid. Code, § 1200, subd. (b).) Among the exceptions available for prior statements of witnesses are inconsistent statements (Evid. Code, § 1235), prior consistent statements (*id.*, § 1236), and past recollection recorded (*id.*, § 1237).

The past recollection recorded exception "permits evidence of a witness's past statement 'if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which: [¶] (1) [w]as made at a time when the fact recorded in the writing actually occurred or was fresh in the witness'[s] memory; [¶] (2) [w]as made . . . (ii) by some other person for the purpose of recording the witness'[s] statement at the time it was made; [¶] (3) [i]s offered after the witness testifies that the statement he made was a true statement of such fact; and [¶] (4) [i]s offered after the writing is authenticated as an accurate record of the statement.' (Evid. Code, § 1237, subd. (a).)" (*People v. Cowan* (2010) 50 Cal.4th 401, 465.)

## 3. Analysis

Carter contends his counsel provided ineffective assistance by failing to object to the admission of the portion of A. Doe's preliminary hearing testimony in which she stated that she " 'could feel [Carter's] penis' " on her butt. Although Carter does not dispute that the first part of A. Doe's prior testimony (concerning her uncle's upper body position) might have satisfied the past recollection recorded exception, he asserts the latter part of her prior

26

testimony (starting with the question whether she could " 'feel anything from the lower half of [Carter's] body?' ") was inadmissible.

Carter maintains that the challenged portion of the testimony is outside the past recollection recorded exception because A. Doe's trial testimony shows she did not suffer "insufficient present recollection" regarding the placement of Carter's lower body (Evid. Code, § 1237, subd. (a)). He further argues that even if the foundational requirements for the exception could be met, a reasonably competent attorney would have objected under Evidence Code section 352. Carter also contends the preliminary hearing testimony does not come within either of the other exceptions for prior consistent statements or for inconsistent statements (Evid. Code, §§ 1235, 1236).

We are not persuaded that defense counsel's failure to object specifically to the latter portion of the preliminary hearing testimony read to the jury fell below an objective standard of reasonableness such that there simply could be no satisfactory explanation for counsel's omission. (See *Mai*, *supra*, 57 Cal.4th at p. 1009.) The trial court's prior overruling of counsel's initial objection to the prosecutor's request to introduce A. Doe's excerpted preliminary hearing testimony suggests the court had made its determination that the excerpted testimony was admissible. Counsel might have reasonably decided that further objections would be futile. (See *Price*, *supra*, 1 Cal.4th at p. 387.)

In addition, defense counsel might have reasonably concluded that the entire excerpt came within the exception for past recollection recorded, which authorizes admission of a statement previously made under specified conditions—all of which Carter agrees were met here—and "the statement concerns a matter as to which the witness has *insufficient present recollection*

27

to enable him to *testify fully* and accurately." (Evid. Code, § 1237, subd. (a), italics added.) A. Doe's recollection at trial of the nap incident was not sufficient to enable her to testify "fully" as to what had occurred, because she could remember only generally that Carter laid on her with his penis "on [her] butt" and not how the rest of his body was positioned. There can be no dispute that the excerpted portion of A. Doe's testimony at the preliminary hearing "concern[ed]" that matter. (*Ibid.*) Thus, counsel might have reasonably decided that the preliminary hearing excerpt came within the past recollection recorded exception and any objection would have been futile.

Furthermore, we are not persuaded by Carter's claim that his counsel was ineffective for failing to object under Evidence Code section 352. Pursuant to Evidence Code section 352, "[a] trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time." (*People v. Scott* (2011) 52 Cal.4th 452, 490 (*Scott*).) "Prejudice for purposes of [Evidence Code] section 352 refers to evidence that tends to evoke an emotional bias against the defendant." (*People v. Crew* (2003) 31 Cal.4th 822, 840.)

Carter contends that allowing the prosecutor to repeat the phrasing concerning A. Doe's ability to feel Carter's penis while she was laying face down on the bed was unduly prejudicial because such repetition might have " 'inflame[d] the emotions of the jury' " and caused it to use the information for an illegitimate purpose. (*Scott*, *supra*, 52 Cal.4th at p. 491.) This argument—premised on the one-time repetition of a single phrase of testimony regarding A. Doe's ability to feel her uncle's penis—is unconvincing. The nature of the charges against Carter and detailed testimony of the three victims about sexual conduct perpetrated by him when they were children, including incidents involving Carter placing his penis in

the victim's mouth and rubbing his body against the victim's clothed body to where she could feel his penis, undermine Carter's contention that the single repetition of A. Doe's testimony that she could feel his penis on her was unduly prejudicial. Given the probative value of A. Doe's testimony that he told her to take a nap, then entered the bedroom and laid on top of her to where she could feel his penis, reasonable counsel may have concluded that objecting to the repetition of the phrase about Carter's penis on the ground of undue prejudice was futile and would have only drawn the jury's attention to evidence. (*Stewart*, *supra*, 33 Cal.4th at p. 509.)

We conclude that because there is a potential, satisfactory rational explanation for counsel's failure to object to the last few sentences of A. Doe's excerpted preliminary hearing testimony, Carter's counsel's conduct did not fall below an objective standard of reasonable assistance. Carter has not carried his burden on appeal to establish ineffective assistance of counsel claim on this ground.[5] (*Huggins*, *supra*, 38 Cal.4th at p. 206.)

*D. Cumulative Error*

Having concluded that Carter has not shown error in any of his asserted claims, there is no prejudicial error to cumulate. (See *People v. Hensley* (2014) 59 Cal.4th 788, 818.)

## III. DISPOSITION

The judgment is affirmed.

---

[5] Carter raises other possible hearsay exceptions (for inconsistent statements and prior consistent statements (Evid. Code, §§ 1235, 1236)) in his appellate briefing but argues neither applies to the challenged testimony. Because we conclude that a reasonable attorney might have determined A. Doe's excerpted preliminary hearing testimony was properly subject to the exception for a past recollection recorded, we need not decide whether the other two exceptions were inapplicable.

_____
Danner, J.

WE CONCUR:


_____
Greenwood, P. J.


_____
Bromberg, J.


**H052267**
***People v. Carter***